Common Pleas Court of Cuyahoga County.

CLOVER MEADOW CREAMERY ET AL V. NATIONAL DAIRY PRODUCTS CO. ET AL.

Decided April 5, 1932.

*Luther Day, I. R. Morris* and *Gordon Locke,* for plaintiffs.

*W. T. Kinder, Herman Nord,* and *Tom Lipscomb,* for defendants.

CORLETT, J.

This is a suit in equity in which the plaintiffs ask for

a restraining order against the defendants and for other equitable relief. The fifteen plaintiffs and two of the defendants, namely, the Telling Belle Vernon Company and the Dairymen's Milk Company, are engaged in the business of buying and selling at wholesale and retail and dealing in milk and milk products in the city of Cleveland and county of Cuyahoga.

Of the fifteen plaintiffs, five are corporations organized and existing under the laws of the state of Ohio, and ten plaintiffs are individuals doing business under firm names. The National Dairy Products Company, Inc., was dismissed as a defendant upon motion at the end of the plaintiffs' case. Two defendants, the Telling Belle Vernon Company and the Dairymen's Milk Company are corporations engaged in the milk business. The defendant, the Greater Cleveland Milk Council is an unincorporated association of about fifty members including corporations and individuals engaged as dealers in the business of distributing milk both wholesale and retail. The defendant, Fred E. Walker, is President of the Greater Cleveland Milk Council, which hereafter will be referred to as the Council, or the Milk Council. Mr. Walker is also engaged as a dealer or distributor of milk and dairy products. The defendant, George J. Callody, is secretary of the Milk Council.

The fifteen plaintiffs charge all of the defendants with the violation of the provisions of the Valentine Antitrust Act of the state of Ohio, and also with entering into a conspiracy in restraint of trade in violation of the Common Law. The petition alleges that:

"The plaintiffs and the defendants other than the Council and Fred E. Walker and George J. Callody, are now and have for more than one year last past been engaged in buying milk and reselling the same wholesale; their wholesale sales of milk have been and are being made to grocery stores, meat markets, delicatessen shops, and all other like dispensaries where such milk is resold to the ultimate consumer, while the retail sales of milk have been and are now being made directly to the ultimate consumer. Such milk so sold by the plaintiffs and the defendants other than the Council and Fred E. Walker and George J. Callody, is and has been purchased by them

from dairymen and farmers at a price of approximately 4 cents per quart. The cost to them of collecting the milk, heating the milk for purposes of pasteurization, cooling it and bottling and distributing it, is now and has been approximately 4 to 6 cents per quart, such cost thereof being dependent upon whether delivery is made upon a wholesale or retail basis while the glass milk bottles in which the milk is contained for ultimate distribution for consumption cost said dealers the sum of approximately 4¼ cents each.

"At the present time and for more than a year last past the plan of milk delivery and the redemption of the milk bottles has been and is as follows: The milk sold wholesale to retailers is contained in a glass bottle having marks thereon indicative of the fact that it is being retailed by grocery store or delicatessen, etc., and having a mark thereon indicative of the price which will be paid by such retailer for its return. The bottles delivered directly to the ultimate consumers do not have such marks and symbols thereon, and are not subject to redemption for a price. The purchaser of milk aforesaid from the delicatessen is required to pay the sum of 3 to 5 cents, as the case may be, for a glass bottle in addition to the price charged for the milk contents and upon the return of such glass bottle such price paid for the bottle is repaid to the purchaser.

"The plaintiffs are competitors each with the other and likewise competitors of each of the defendants other than the Council and its defendant president and secretary, and are competitors with each of the members of said Council and the members of said Council are likewise competitors each with the other. The defendants Telling and Dairymen's are members of said Council * * * and by means of fear, intimidation and coercion Telling, through and in connection with Dairymen's largely dominates and controls the members of the Council and dominates and controls the action of the Council.

"Longer ago than a year last past the defendants entered into an unlawful combination and conspiracy having for its purpose the complete control over the marketing and the market price of milk in the city of Cleveland and the county of Cuyahoga, Ohio, the compulsory fixing of prices to be charged by the milk dealers in said community, and the wholesale and retail purchasers and consumers thereof, and to that end have, by devices, acts and instrumentalities hereinafter more specifically set forth, sought to eliminate the plaintiffs and other independent milk dealers in said vicinity from said business.

To that end the defendants have, during and prior to the year last past through concerted action and agreement, sometimes but not exclusively voiced through the action of the Council, endeavored to eliminate from such competition the plaintiffs and other independent dealers by reducing the wholesale and retail selling price of milk in said community to a figure which not only deprives the plaintiffs and the defendants of any profit whatsoever, but which in truth and in fact subjects and has subjected the milk dealers (including the defendants) of said community to a loss. As part of said plan and scheme, the defendant dealers caused the members of the Council and of necessity the other dealers of said vicinity not members of the Council, to reduce the price of milk from 12 cents per quart to 10 cents per quart, effective on or about the 1st day of June, 1931, by arbitrarily refusing to abide by the majority vote of the members of Council rejecting a resolution having said reduction for its object, and by announcing that they would reduce the price accordingly regardless of the economics of the situation. Said retail price of 10 cents per quart for said milk not only deprives the dealer of any profit whatever, but imposes loss upon him whoever he may be."

The petition then alleges that on or about the 23d day of November, 1931, the Milk Council by action of a few of its members adopted a resolution providing for free bottles on and after December 17, 1931, so that no deposit for bottles would be required at the store when a sale of milk was made, and that the elimination of this charge or deposit on the part of the consumer guaranteeing the return of the bottle operated as a reduction in price to the purchaser and an increase in price to the dealer or distributor. Plaintiffs allege that by the elimination of the bottle charge or deposit the percentage of loss of bottles is wholly unnatural and uneconomical and will result in monetary loss to the dealers, and has for its sole object and purpose the elimination of those dealers whose financial resources will not permit the sale of milk with such attendant losses. Again referring to the petition:

"Plaintiffs further say that if the defendants are permitted to carry on and execute said unlawful scheme or device the business of these plaintiffs and other independ-

ent dealers will be entirely eliminated and the free, natural and unrestricted competition in said business will be at an end with the larger companies left as sole survivors to enjoy a monopoly in the business in the aforesaid vicinity."

The balance of the plaintiffs' petition in specific terms alleges a violation of the Valentine Anti-trust Act of the state of Ohio, and is in the following language:

"The plaintiffs say that the dealer defendants Telling and Dairymen's and certain of the members of defendant Council have combined their capital, skill and acts, to create and carry out restrictions in the milk trade and in commerce therein to reduce the price of milk to prevent competition in the wholesale and retail sale of milk, and in the purchase of raw milk for resale, to fix the standard or figure whereby the price of milk to the public or the consumer is controlled and established, and, as to the dealer it is compelling dairymen to enter into, execute and carry out contracts, obligations and agreements by which they will bind or have bound themselves not to sell, dispose of or transport milk below a common standard figure or fixed value and by which they have agreed or will in future agree to keep the price of milk at a fixed or graduated figure and by which they have established or will establish and settle the price of milk between them and between themselves and others, which contracts, obligations and agreements preclude a free and unrestricted competition among themselves, purchasers and consumers of milk, and in its sale, and by which they have agreed or will agree to pool, combine and directly or indirectly unite their interests and the interests of others which they have, connected with the sale and the transportation of milk to the end that defendant's wholesale and retail sales prices will be affected."

The prayer of plaintiffs' petition is that all of the defendants, including the president and secretary and members of the Milk Council be restrained and enjoined by order of court from proceeding to put into effect the free bottle plan, from threatening and coercing, interfering with or intimidating the plaintiffs, and from interfering in any manner with the free and unrestrained competition among the milk dealers of the city of Cleveland and for such other and further relief as may be decreed by the court.

To this petition of the plaintiffs' each of the defendants have filed answers in which the corporate existence of the parties is admitted, and the fact that the corporations and individuals are engaged in the milk business as alleged, and the existence of the association known as the Greater Cleveland Milk Council and that Fred E. Walker is president and George J. Callody is secretary of the Milk Council, and the answers deny each and every other allegation in plaintiffs' petition.

In reviewing the facts and law of this case the court hesitates to encumber this opinion with unnecessary facts and law. The case has been carefully tried by counsel and ably argued. At the request of the court the testimony was transcribed and is now before the court covering about twenty-five hundred pages. Voluminous briefs have been filed by counsel. In the introduction of evidence no doubt the court allowed a greater degree of latitude than was necessary to a proper adjudication of the issues involved. Since the case was submitted the court has very carefully reviewed the record and has read the briefs and studiously perused twelve or fifteen hundred pages of law in all of the leading cases cited by counsel in their briefs. This the court found necessary because of the fact that in the recent case of *List* v. *Co-Operative Assn.*, 114 O. S., 361, the Supreme Court of this state applied the "rule of reason" in construing and interpreting the Valentine Anti-trust Act, thus following the decisions of the United States Supreme Court since the cases of *The Standard Oil Company of N. J.* v. *U. S.*, and *The American Tobacco Co.* v. *U. S.*, reported in 221 U. S. pages 1 and 106, and if, in reviewing the facts and law in this case, this court seems to indulge in an apparent fatiguing prolixity, it is due to an effort of the court to reconcile the opinions of the Supreme Courts of the United States and of the state of Ohio since the passage by Congress of the Sherman Anti-trust Act on July 2, 1890, and the Valentine Anti-trust Act of the state of Ohio, which became effective July 1, 1898.

So far as this court has been able to find, the instant case in its magnitude and importance is the only one that has been tried in the courts of this state since the List

case, *supra*, was decided. Sufficient references must be made to the voluminous record in this case and to the law to indicate the reasons for the findings of fact and also the findings of law applying to those facts.

The evidence shows that in the greater Cleveland area with a population of 1,250,000 there is a daily distribution of 410,000 quarts of milk wholesale and retail, this distribution being made by 130 dealers; the 51 members of the Milk Council distributing about 66% or 269,980 quarts, and dealers not members of the Council in 1931 distributing daily 34% or 140,000 quarts. The Telling Belle Vernon Company, which is the dealer handling the largest volume in the community, has an average daily distribution of 100,000 quarts. The Dairymen's Milk Company, next largest, handles 32,000 quarts daily. This milk is shipped into the city from what is known as the "Cleveland Milk-shed" an area within a radius of 150 miles from the city of Cleveland. There are about 4,500 farmers or producers shipping this milk and it is estimated, on the basis of an average of $1\frac{1}{8}$ quarts per customer, there are 375,000 customers.

For at least three years last past the Telling Belle Vernon Company has maintained what has been known in the trade as a "card price," this price varying from 12 to 14 cents retail and from 9 to 11 cents wholesale for the year 1929; an average of 12 cents retail and 10 cents wholesale during the year 1930; and for the first five months of 1931 the card price for retail milk was 11 cents and 10 cents for the last seven months; that a card price of 9 cents wholesale obtained during the first five months and 8 cents for the last seven months of the year.

During those three years the plaintiffs and many other smaller dealers not parties to this case nor members of the milk Council sold their milk wholesale for from 6 cents to $6\frac{1}{2}$, 7, $7\frac{1}{2}$ and 8 cents wholesale with a differential of 1 cent between the wholesale and retail price, and at the same time most of the plaintiffs endeavored to maintain a differential of 1 cent between plaintiffs' price and the card price of Tellings—that is, the plain-

tiffs maintained a price of about 1 cent less per quart than the card price.

During this period of three years, and more particularly during the last year and a half prior to the filing of this case there were so-called "cut-throat" wars, mostly between the plaintiffs, in various sections of the city; these cut price wars were between the plaintiffs themselves and between the plaintiffs and other dealers not members of the Milk Council. The Telling Belle Vernon Company and Dairymen's scrupulously maintained their card prices and refused to enter into competition by cutting prices. The evidence shows that the Telling Belle Vernon Company sustained substantial losses in their wholesale trade as a result of these cut prices.

All of the witnesses for both plaintiffs and defendants agree that during the year 1931 and at the present time the milk industry of the city of Cleveland has been in a "deplorable," "chaotic," and "disorganized" condition. A great volume of testimony was introduced in regard to various plans upon which purchases of milk are made from the farmer or producer. For the purposes of this case the court believes that it is unnecessary to consider this latter evidence further than to observe that apparently the reduction in the price of milk with the consequent competition between the dealers, resulting in price wars, arises out of an over-production of this commodity; and the milk industry, including the producers and distributors, is subjected at this time to the same distressing condition encountered by all other dealers and producers of commodities of various kinds; and, as more fully discussed hereafter, the solution will not come from judicial decree or legislative enactment but by a willingness to submit to the inevitable and immutable law of supply and demand.

As to the Milk Council, the record shows that it was organized about July 1, 1929, and that for some years previous to that date there had been another organization or association of milk dealers known as the Cuyahoga Dairy Products Dealers' Association. The Constitution, By-Laws, and Code of Ethics of the Greater Cleveland Milk Council, effective July 1, 1929, provided, among

other things, that "the slogan of the Association shall be 'Milk for Health,' the object of the Association is to improve the quality of the milk supply, to study the many economic, scientific and practical problems which may arise from time to time, and to exchange ideas which may be of mutual benefit to the members of the Association and the public."

"Section 2. To inculcate and maintain the principles of fair dealing between members, producers and the buying public.
"Section 3. To assist members of this association in all knowledge that will lessen the costs of plant operation and delivery."

The annual dues were at the rate of $12 per year for a retail route, $24 a year for wholesale route, and $18 per year for combination wholesale and retail routes, payable monthly in advance. In accordance with these provisions the total dues paid in by members during 1931 amounted to $8,004. Of this sum the Telling Belle Vernon Company paid $3,300, and the next largest sum was paid by the Dairymen's Milk Company—$690.

An examination of the Minutes of the Milk Council discloses that for about the first year of its existence the discussions were confined largely to trade practices and customs, also some discussion of the relationship existing between the dealer and the producers, but beginning with the meeting of May 5, 1930, we find such entries as the following:

"May prices to producers to remain same as in previous month."

On July 7, 1930:

"There was a great deal of discussion in regard to several east side dealers wanting *closed competition* and it was decided to call them together to a meeting and discuss the question." (The italics are by the court.)

November 24, 1930:

"Secretary instructed to get out letter informing all members that discounts and commissions to janitors be positively discontinued December 1, 1930."

December 29, 1930:

"There was a general discussion of conditions in the local milk market participated in by nearly everyone present. *It was generally understood* that there would be a change in market effective January 1, 1931."

May 4, 1931:

"Motion by Andre, seconded by Meyer, to reduce deposit rate on quart store bottles from 5 to 4 cents, effective Saturday, May 9, 1931, and redeeming rate at 4 cents effective Monday, May 11, 1931, carried."

It may be mentioned here that Mr. Andre at all times complained of in plaintiffs' petition and at the present time is president of the Telling Belle Vernon Company.

There is a great deal of testimony in the record by various witnesses who attended a meeting of the Milk Council on May 29, 1931, at which there was a general discussion in reference to a reduction in price of milk. Plaintiffs claim that a majority of those present in numbers voted against this proposal, but that F. E. Walker, president of the Milk Council, and who was presiding at the time, after a *viva voce* vote declared that a *majority of those present* were opposed to the reduction in price but that a *majority of the volume of milk represented* was in favor of the reduction, and in the minutes of this meeting we find the following entry:

"The meeting in charge of F. E. Walker, Chairman, *decided by majority milk represented* that the supply of milk was continually increasing, sales not maintaining production increase."

"Several dealers representative of Cleveland market at this time announced a change in price downward."

Telling Belle Vernon Exhibit No. 8 shows that the retail price on June 1st was reduced from 11 to 10 cents and that the wholesale price was reduced from 9 to 8 cents.

The following entry appears in the Minutes of the Milk Council meeting held June 15, 1931:

"A discussion arose as to the possibility of reducing deposit rate on pint and half pint bottles. It was finally decided to leave deposit rate as is at 3 cents."

In the minutes of October 5, 1931, we find a motion was passed reducing the rate on store bottles to 3 cents for quarts and 2 cents on smaller sizes, effective October 12—

"Motion carried, Secretary instructed to notify all members about it."

About this time many meetings were being held by members of the Milk Council to which other non members dealers were invited, *the sole discussion being as to prices*, although in the minutes references are made to these matters as a discussion of "trade practices," and at the meeting of October 31, 1931, a committee was appointed to call upon store keepers on the West Side of Cleveland to discuss with them the matter of "levelling off" their prices, or in other words to bring prices up to somewhere near the card price established by the larger companies.

We find that the situation in reference to the inability of the controlling officers and members of the Milk Council, who represented the larger interests, to "level off," "stabilize" or "bring up" the price of milk to the card price was becoming more coercive during the month of October, more frequent meetings were being held, and at these meetings the members were becoming more bold and less evasive in their discussion and there was more and more talk about prices and the inability to bring certain members into line, and in all of these discussions the free bottle plan was frequently mentioned, as the plaintiffs claim, as a threat or coercive measure.

The testimony covering the cost of milk from the producer, processing expense, and distribution costs vary from slightly less than 5 cents per quart to about 7 cents per quart. The cost of bottles by the gross was uniform, and amounted to slightly over 4 cents per bottle.

The plaintiffs' testimony indicates that they anticipated a loss of 40 to 50% on bottles returned under the free bottle plan. When the case was tried the plan had been in effect about a month, an insufficient length of time to determine with any degree of accuracy what the actual loss would be.

The testimony of Mr. Andre, President of the Telling Belle Vernon Company, Mr. Jones, Sales Manager of the same company, as well as the testimony of Mr. Cornelius, Manager of the Free Bottle Exchange, which company is engaged in collecting and returning unclaimed bottles, together with the exhibits prove conclusively that substantial losses of ·bottles were anticipated.

At a meeting of the Milk Council November 16, 1931, a motion was made by Mr. Knirk, President of the Dairymen's—

"That the Bottle Exchange be reorganized so that it can handle increase in volume."

The minutes of *a meeting of the Milk Council held November 21, 1931, in the office of Mr. Andre, President of the Telling Belle Vernon Company,* contained the notation—

"Seventeen representative Cleveland milk dealers met in Mr. Andre's office at which time Cornelius and Callody reported on the free milk bottle situation."

This was a Saturday meeting and was adjourned to the following Monday, November 23, 1931, at which meeting twenty-two dealers were present. There is this entry in the Minutes:

"Motion duly seconded that dealers adopt a free bottle beginning December 17, 1931, carried. 18 yea; 2 no. Secretary instructed to notify all members of Milk Council of this action."

Before we leave the minutes of the Milk Council we may note that there are several entries similar to the following:

"March price to remain same as January and February."

The plaintiffs' allegation of a conspiracy in restraint of trade is based largely upon their claim that as a last resort the free milk bottle plan was adopted as a coercive measure or weapon to force the plaintiffs and other dealers to raise their prices.

Plaintiffs' Exhibit 28 is a copy of the minutes of a special meeting of the Board of Directors of the Milk Bottle Redemption Company held November 28, 1931, showing the passage of a resolution that the manager of said company be authorized to purchase additional facilities to handle the expected increase in the company's business.

Exhibits of the Telling Belle Vernon Company and of the City Sealer of the city of Cleveland, show a very substantial increase in the number of bottles purchased by the larger dealers, especially the Telling Belle Vernon Company, in anticipation of losses to be sustained after the adoption of the free bottle plan. Purchases made by the Telling Company during October, November, and up to December 17, when the free bottle plan went into effect, discloses that this company purchased on an average of 54,000 per month. Beginning with December 19, 1931, there was a very substantial increase in purchases, 643,392 being the number of bottles purchased between December 19, 1931, and February 20, 1932, or an average of 321,696 per month.

The testimony of Mr. Cornelius, Manager of the Bottle Redemption Company is to the effect that the Telling Company owned 71 shares of stock in this Bottle Redemption Company and that after the adoption of the free bottle plan said company increased its holdings to 398 shares, and that the adoption of the free bottle plan increased the business of the exchange approximately 100%.

It is interesting to observe the manner in which the directors of the Milk Council approached their final action in bringing about the adoption of the resolution providing for free bottles. After many meetings of the members during October and the early part of November, at which the sole subject of the extremely acrimonious discussions was "prices" and "free milk bottles," we find Mr. Callody, secretary of the Milk Council sending out the following letter which, because of its importance, is set forth in full:

"P Ex One.

The Greater Cleveland Milk Council,
    10006 Carnegie Avenue.
        Room 2.    Cedar 3282.
            Cleveland, Ohio.                    Nov. 11, 1931.
George J. Callody,
    Secretary.
To All Milk Dealers In Cleveland and Vicinity:

At no time, for a good many years, has the Cleveland milk market been as ragged and rough as it is today. Something should be done about it. *Something will be done about it!* Whatever is necessary to correct present bad trade practices, should be started at once, as there has been much delay already, and conditions continue to get worse.

With above in mind, we were instructed to call a mass meeting of all milk dealers in this vicinity, to be held at Hotel Winton, Friday, Nov. 13, 1931, at 8 p. m., at which time every dealer will have an opportunity to voice his opinion and perhaps have a suggestion as to the way out.

Come yourself, and make sure your neighbor competitor comes also. Better still, why not come down with him? It will pay you in the long run.

Refreshments will be on hand after the meeting. Try to be prompt at 8 p. m., at Hotel Winton. Don't miss it!

Greater Cleveland Milk Council,
                        George    Callody,
GC/GP.                                   Secretary.

At the meeting of November 13, 1931, called in accordance with the above letter we find plaintiffs and other dealers and representatives including Mr. Bishop who was representing the Co-operative Milk Producers Company and the Co-Operative Service Company, one of the largest dealers in Cleveland, protesting vigorously against the threatening and coercive language used in the letter of November 11.

But notwithstanding the many protests the plan was adopted at the meeting of November 23, as referred to above. Mr. Andre and Mr. Jones, both officials of the Telling Company testified that they expected the adoption of the free bottle would bring about an increase in price on the part of the plaintiffs and other competitors and

that the Telling Company would thereby increase their sales by eliminating competition.

When the plaintiffs found their opposition to be of no avail they, with others, withdrew from the Milk Council and formed or brought to life the Cuyahoga Dairy Products Dealers' Association and hired one Berkens as Secretary and Manager, and at one meeting at the Chamber of Commerce between Mr. Berkens, representing the plaintiff dealers and members of his organization and Dr. Rouche representing the Telling Belle Vernon Company, and Mr. Knirk, President of the Dairymen's Company, Mr. Berkens suggested that he had found upon coming to Cleveland from Chicago that—

"Conditions were so bad that something ought to be done and that in his judgment the thing to do was to bring Chicago methods into Cleveland."

Apparently plaintiffs brought this action for injunctive relief on advice of able counsel for plaintiffs rather than to attempt a solution of their problem by "racketeering" and criminal methods.

---

We come now to the application of well established legal principles to the facts in the case.

The plaintiffs allege a violation of the Valentine Antitrust Act, effective July 1, 1898. The pertinent sections of this Act read as follows:

Section 6391, General Code: Definition of Trusts—A trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, for any or all of the following purposes:

1. To create or carry out restrictions in trade or commerce.

2. To limit or reduce the production or increase, or reduce the price of merchandise or a commodity.

3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or a commodity.

4. To fix at a standard or figure, whereby its price to

the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.

5. To make, enter into, execute or carry out contracts, obligations or agreements of any kind or description, by which they bind or have bound themselves not to sell, dispose of, or transport an article or commodity, or an article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of an article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers or consumers in the sale or transportation of such article or commodity, or by which they agree to pool, combine, or directly or indirectly unite any interests which they have connected with the sale or transportation of such article or commodity, that its price might in any manner be affected. Such trust as is defined herein is unlawful, against public policy and void."

Section 6393, General Code: Illegal contract—A contract or agreement in violation of any provision of this chapter is void and not enforceable either in law or equity."

This Act has been held constitutional by the Supreme Court of the state of Ohio: *State, ex rel. Monnett,* v. *Buckeye Pipe Line Co.,* 61 O. S., 520; *State* v. *Gage,* 72 O. S., 210. In both of these cases the court held:

"The legislature can prohibit those uses of property which are *hurtful to the public.*"

And further:

"The prohibited contract must be *hurtful to the public and hurtful in a legal sense.*"

In the case of *State, ex rel.,* v. *Standard Oil Co.,* 49 O. S., 137, it was held in paragraph 3 of the syllabus that an agreement between the stockholders of the defendant corporation and the other companies by which a pooling of stocks was effected was "against public policy." On page 186, said Judge Minshall:

"Monopolies have always been regarded as contrary to the spirit and policy of the common law."

On March 16, 1926, the Supreme Court of this state applied the "rule of reason" in the interpretation and construction of the Valentine Anti-trust Act. The opinion in this case which was written by Marshall, C. J., will be considered more at length later in this opinion.

In applying ourselves to a study of the opinions of the cases hereinafter cited, it may be of assistance to us, in attempting to differentiate between those opinions and to reconcile them, if we keep in mind certain salient facts. For twenty-five years from the end of the Civil War up until the second day of July, 1890, when Congress enacted the Sherman Anti-trust Act, with the exception of one or two brief periods of depression, this nation experienced a period of the greatest industrial activity and growth in the world's history. The Standard Oil Company of Ohio had been organized in the city of Cleveland by John D. and William Rockefeller, and several other individuals in the year 1870. This company had acquired all but three or four of the thirty-five or forty oil refineries located in Cleveland, Ohio, and in subsequent years bought out or gained control of other oil industries and refineries in the United States and throughout the world until in 1890 it became perhaps the largest and most powerful organization in the world. The tobacco industry and the railroads had likewise reached mammoth proportions.

The modern trust came into being and was often referred to in the newspapers, magazines and in speeches of politicians, legislators and statesmen as an octopus reaching out with its tentacles to gather in by legitimate or illegitimate means and to crush all competitors. Anti-trust sentiment was finally crystallized into the enactment of the Sherman Anti-trust Law. In a very learned and vigorous dissenting opinion of Mr. Justice Harlan in *Standard Oil Co.* v. *United States*, 221 U. S., 83, we find the following language:

"All who recall the condition of the country in 1890 will remember that there was everywhere, among the

people generally, a deep feeling of unrest. The nation had been rid of human slavery—fortunately, as all now feel—but the conviction was universal that the country was in real danger from another kind of slavery sought to be fastened on the American people, namely, the slavery that would result from aggregations of capital in the hands of a few individuals and corporations controlling, for their own profit and advantage exclusively, the entire business of the country, including the production and sale of the necessaries of life. Such a danger was thought to be then imminent, and all felt that it must be met firmly and by such statutory regulations as would adequately protect the people against oppression and wrong."

The statutory regulations enacted to correct the existing evils was the Sherman Anti-trust Act. During the twenty-one years between its passage on July 2, 1890, and May 15, 1911, most of the members of the legal profession of this country evidently assumed that the Sherman Anti-trust Act had enlarged the common law powers and authority of courts of equity in dealing with corporations and individuals charged with the commission of acts in restraint of trade, and that these enlarged powers were in addition to those previously conferred upon courts of equity by the common law. Some of the cases decided by the Supreme Court of the United States during this period of time will be given attention later on in this opinion..

On May 15, 1911, and on May 29 of the same year the following cases were decided by the Supreme Court of the United States: *Standard Oil Co. of N. J. et al.* v. *United States*, 221 U. S., 1; *United States* v. *Tobacco Co.*, 221 U. S., 106.

Mr. Chief Justice White wrote the opinion in both of these cases and established the "rule of reason" as a legal principle to be applied in the interpretation of Anti-trust legislation. This is still the law as applied to Interstate Commerce.

As previously stated the Valentine Anti-trust Act of this state, which closely follows the language of the Federal Act, became effective the 1st day of July, 1898, and twenty-eight years later, namely, March 16, 1926, in the

case of *List* v. *Co-operative Assn.,* 114 O. S., 361, the Supreme Court of this state applied the "rule of reason" to the Valentine Anti-trust Act in the following language found in the fourth paragraph of the syllabus of this case:

"Contracts in restraint of trade are not illegal except when *unreasonable* in character."

The earliest case in the United States Supreme Court construing the Federal act was *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S., 290. This was a five to four decision in which the majority opinion, written by Judge Peckham, declared for a *strict interpretation* of the Act and that *any* restraint upon Interstate Commerce would constitute a violation, and yet conceded that certain contracts or agreements would continue to be enforceable in accordance with *well established and recognized principles of common law,* which had existed for several hundred years in both this country and in England.

Mr. Justice White wrote the dissenting opinion which was concurred in by Justices Field, Gray and Shiras. In this extraordinarily learned and exhaustive opinion Mr. Justice White, who fourteen years later wrote the majority opinion as Chief Justice of the Supreme Court of the United States establishing the rule of reason in its application to those cases, held that Congress in passing the Sherman Act did not intend to declare all contracts in restraint of trade as unlawful, but only such contracts as unreasonably restrained trade were violative of the general law. On page 346 of this case we find Justice White using the following language:

"Is it correct to say that at common law the words restraint of trade" had a generic signification which embraced all contracts which restrain the freedom of trade whether reasonable or unreasonable, and, therefore, that all such contracts are within the meaning of the words 'every contract in restraint of trade'? *The rudiments of the doctrine of contracts in restraint of trade are found in the common law* at a very early date."

Reference is then made to some of the early cases to

support his conclusion that the enactment of the Anti-trust law of Congress did not include all acts in restraint of trade. Further quoting from his opinion:

"To find, then, 'in restraint of trade' has embraced every contract which in any degree produced that effect would be violative of reason, because it would include all those contracts which are the very essence of trade, and would be equivalent to saying that there would be no trade and therefore nothing to restrain."

And he concludes that the Congress in referring to "unlawful restraints and monopolies" by the use of the word "unlawful" clearly distinguished between contracts in restraint of trade which are lawful and those which are not, in other words between those which are unreasonably in restraint of trade, and consequently invalid, and those which are reasonable and hence lawful.

We find that fourteen years later Mr. Justice White, then Chief Justice of the Supreme Court, in delivering the majority opinion of the court followed the same logic in establishing the rule of reason in this language:

"The construction which we have deduced from the history of the Act and the analysis of its text *is simply that in every case where it is claimed that an act or acts are in violation of the statute the rule of reason, in the light of the principles of law and the public policy which the act embodies*, must be applied."

In *Chicago Board of Trade* v. *United States*, 246 U. S., 231, decided March 4, 1918, Mr. Justice Brandies in delivering the opinion of the court gave us the true test to be applied in the instant case, quoting from his opinion:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. *The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may oppress or even destroy competition.*"

Having provided ourselves with the test that must be applied to the evidence in the instant case, let us review some of the decisions where the facts involved were

similar. The following cases were cited as supporting the contention of the plaintiffs:

*United States* v. *Trans-Missouri Freight Assn.*, 166 U. S., 290; *United States* v. *Joint Traffic Assn.*, 171 U. S., 505; *Standard Oil Co.* v. *United States*, 221 U. S., 1; *United States* v. *American Tobacco Co.*, 221 U. S., 106; *Eastern States Lumber Assn.* v. *United States*, 234 U. S., 600; *American Column Co.* v. *United States*, 257 U. S., 377; *United States* v. *American Linseed Oil Co.*, 262 U. S., 371; *United States* v. *Trenton Potteries Co.*, 273 U. S., 392.

In the Trans-Missouri case, *supra*, which was decided March 22, 1897, and in which Justice White wrote the dissenting opinion, to which reference has previously been made, by a five to four opinion the court decided:

"The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it."

And the contracts or agreements of the Trans-Missouri Freight Association were declared in violation of law.

In the Joint Traffic Assn. case, *supra*, the court held that an agreement between the members of the Association for the fixing of rates and fares was illegal and the court reaffirmed the law established in the Trans-Missouri case.

In both the Standard Oil and the American Tobacco cases previously referred to, and in which the rule of reason was applied, the court held that the combinations were in violation of law. The syllabus in the Standard Oil case is as follows:

"The Anti-Trust Act of July 2, 1890, should be construed in the light of reason; and, as so construed, it prohibits all contracts in combination which amount to an unreasonable restraint of trade in Interstate Commerce. Combination of the defendants in this case is unreasonable and undue restraint of trade in petroleum, and its products, moving in Interstate Commerce, and falls within the prohibitions of the Act as so construed."

The following paragraph is in the syllabus of the American Tobacco Company case:

"The words 'restraint of trade' at common law, and in the law of this country at the time of the adoption of the Anti-Trust Act, only embraced acts, contracts, agreements or combinations which operated to the prejudice of the public interest by unduly restricting competition or by unduly obstructing due course, and Congress intended that these words as used in that act should have a like significance."

After the decision in these cases we find in the opinions of the courts frequent use of the words "to the prejudice of the public interest by unduly restricting commerce or by unduly obstructing due course of trade," as used in the above syllabus.

The first case of importance decided by the United States Supreme Court after the application of the "rule of reason" is *American Column Co.* v. *United States, supra,* decided December 19, 1921, the opinion being written by Mr. Justice Clarke. The facts in this case were very similar to the facts in the case we are deciding. Some four hundred corporations and individuals engaged in the manufacture of one third of the hardwood output of the country established an association under what was known as an "Open Competition Plan." Mr. Justice Clarke incorporates into his opinion many quotations from the circulars and letters sent to the members by the secretary of the association. Frequent meetings were held by the members in which "uniformity of trade practices" was discussed. Frequent references were made in the letters in regard to "over-production" and the necessity for controlling over-production in order that prices might be "stabilized" and kept "at a uniform rate." The members of the association were urged "not to cut prices" and the necessity "of maintaining a price level that would enable them to make a reasonable profit."

On page 408 of the opinion we find the following quotation from one of the Association's reports sent out by the secretary.

"We have always left these meetings feeling that we did not get enough money for our lumber, and that we ought to try to do better."

Mr. Justice Clarke, referring to the "Plan," says:

"The members of the Association were guilty of acts which were inconsistent with that free and unrestricted trade which the statute contemplates shall be maintained; and that the persons conducting the association fully realized this is apparent from their protesting so often as they did, in many of their confidential communications in this regard, that their purposes were not unlawful, and that they sought only to supplant 'cut-throat' competition with what in their own judgment would be 'fair and reasonable competition,' and to obtain, not make fair prices, and their repeated insistence that the Sherman Law designed to prevent the restraint of trade is itself one of the greatest restrainers of trade and should be repealed."

The record in this milk case, and the manner in which the defendants testified on the witness stand, and the fact that each one of the defendants protested vigorously against the accusation that they had entered into contracts and agreements as to prices, is an indication that they fully realized that their purposes were unlawful and their denials of any feeling of restraint or that there were any agreements or contracts as to prices for milk, is but the manifestation of a guilty conscience on the part of each defendant. The written words of their minutes speak louder than their protestations.

In the American Column case it was held that the agreement *as manifest by the acts and transactions* of the members of the association amounted to a restriction of competition and a restraint of trade in violation of law. This case as well as others to be referred to later, including the case of *State, ex rel.,* v. *Business Assn.,* decided by Judge Dempsey of this court on February 11, 1931, are uniform in holding that any association or organization of corporations or individuals engaged in a like business may meet and discuss prices, gather and disseminate statistics and general information affecting the industry. The opinions likewise uniformly hold that when threats are made or coercive measures adopted, whether the measure be lawful or unlawful, if the effect is to restrict competition or unreasonably restrain trade, the same is in violation of law.

In the American Linseed case, *supra,* the law as written into the syllabus held:

"That an association of manufacturers of Linseed Oil products 'to furnish schedules of prices and terms of sale *and adhere* to them' had the necessary effect of suppressing competition, and was therefore in violation of the Sherman Act."

In this case it was held that the efforts of the members of the Association *in attempting the "stabilization" of prices amounted to nothing less than fixing prices* and on page 390 is the following language:

"Concerted action through combination is forbidden when the necessary tendency is to destroy the kind of competition to which the public has long looked for protection."

In the Trenton Potteries case, *supra,* paragraph 2 of the syllabus stated the law as follows:

"An agreement of those controlling over 80% of the business of manufacturing and distributing sanitary pottery in the United States, to fix and maintain uniform prices, violates the Sherman Act, whether the prices in themselves were reasonable or unreasonable."

In his opinion Mr. Justice Stone says:

"The essense of the law is injury to the public. It is not every restraint of competition and not every restraint of trade that works an injury to the public; it is only an undue and unreasonable restraint of trade that has such an effect and is deemed to be unlawful."

The court held that the members of the Pottery Association controlling 82% of the business of manufacturing and distributing in the United States vitreous pottery combined to fix prices.

In the Eastern States Lumber Association case it was held that when dealers were placed "under the coercive influence of a condemnatory report circulated amongst others," those guilty of the acts exceeded their lawful rights and brought them within the condemnation of the law.

We have found that in this state our Supreme Court has adopted the principle of law, even before the application of the "rule of reason," that any acts hurtful to the public and hurtful in a legal sense should be prohibited.

The following cases among others were cited by able counsel for the defendants:

*Chicago Board of Trade* v. *United States,* 246 U. S., 231; *United States* v. *United States Steel Corporation,* 251 U. S., 407; *Window Glass Manufacturers* v. *United States,* 263 U. S., 403; *Maple Flooring Assn.* v. *U. S.,* 268 U. S., 563; *Cement Mfgrs. Assn.* v. *U. S.,* 268 U. S., 588; *Standard Oil Co.* v. *United States,* 283 U. S., 163; *List* v. *Co-operative Assn.,* 114 O. S., 361; *Early* v. *Co-operative Assn.,* 115 O. S., 185.

The court has already commented on the opinion of Justice Brandies in the Chicago Board of Trade case. In this case the agreement of the Chicago Board of Trade to maintain prices during a brief period of the day without attempting to fix prices of buyers or sellers of the commodity was not in violation of the law.

The Window Glass case, *supra,* was a case wherein window glass manufacturers entered into an agreement with their employees for the purpose of regulating their hours of employment and evenly distributing the work among the men. It was held that this was not a violation of law.

The Maple Flooring case, *supra,* held that:

"Trade associations or combinations of individuals or corporations which, as in this case, openly and fairly gather and disseminate information as to the cost of their product, the actual prices it has brought in past transactions, stocks on hand and approximate cost of transportation from the principal point of shipment to point of consumption, and met and discussed such statistics *without reaching or attempting to reach any agreement or concerted action respecting prices, production or the restraining of competition,* do not thereby engage in an unlawful restraint of commerce." (The italics are ours).

This case was cited by counsel for the defendants, but

it is authority for the legal conclusion that the defendants in this case, as the powerful and controlling members of the Greater Cleveland Milk Council were entirely within the law during the first year or year and a half of the existence of the Council when their activities were confined to the gathering and dissemination of information, but when they "reached or attempted to reach any agreement or concerted action respecting prices, production or the restraining of competition," they thereby engaged in an unlawful restraint of commerce.

In this latter case it is interesting to note that Mr. Chief Justice Taft, and Mr. Justice Sanford dissented from the opinions of the majority of the court on the ground that in their judgment the evidence brought the case substantially within the rule stated in the American Column Company and American Linseed Oil cases. The Cement Manufacturers Association case was decided by the Supreme Court at about the same time of the Maple Flooring case. This was a six to three decision. Mr. Chief Justice Taft, Mr. Justice Sanford and Mr. Justice McReynolds dissenting. The majority opinion in finding that there was no violation of law, however, did find as stated in paragraph three of the syllabus that:

"The evidence does not show any effect on prices and production,"

produced by the activities of the members of the association.

In the latest case of the United States Supreme Court, decided April 13, 1931, *Standard Oil Company* v. *United States*, 283 U. S., 163, the court found as set forth in its syllabus:

"It is not shown that, by agreeing upon royalty rates, the patentees could control the price or supply."

Throughout the trial of this case and in the briefs of defendants' counsel, we find counsel relying upon the most recent decision of the Supreme Court as set forth in the List and Early cases, *supra*. The opinion in the Early case merely referred to the List case, decided shortly before and affirmed the opinion in that case. It is sig-

nificant that in both of these cases the Associations had been organized under Co-operative marketing acts of the state of Ohio and the state of Kentucky.

In the List case at page 376 Chief Justice Marshall, referring to the Maple Flooring and Cement Manufacturers Association cases, *supra,* says:

"The Supreme Court of the United States in two rather recent cases has declared trade associations and combinations to be lawful when formed for the purpose of gathering and disseminating information as to cost of product, volume of production, and other similar and related matters, where there was no agreement among their members, *'or concerted action reached or attempted to lessen production or arbitrarily raise prices.'*" (The italics are ours).

And on page 378 the following:

"The transactions which are forbidden include agreements to restrict production for the sole purpose of enhancing prices, stifling competition, or creating a 'corner,' *fixing prices at a definite standard, or combining in a manner that has a necessary tendency to oppress competitors or the public.*"

From the overwhelming weight of the evidence referring to the activities of the members of the Milk Council during the months of October and November, up to the time of the adoption of the free bottle plan by a mere score of milk dealers in the city of Cleveland, no other conclusion can be reached except that the acts or "transactions" had as their very purpose fixing or raising prices up to the so-called "card-price" and that when the smaller dealers refused to raise their prices, since they felt satisfied, as the evidence indicates, that they were making a fair profit at the lower scale, the coercive weapon in the form of the free bottle plan was adopted, which free bottle plan if continued in the present market can have no other result except to increase the cost of the commodity, or finished product to the consumer.

On page 379 of the List case the court finds:

"There has been no effort to crush or oppress other producers of tobacco."

The testimony of the plaintiffs and the defendants themselves in reference to the frequent meetings just previous to the adoption of the free bottle plan indicate that they were of such an oppressive nature as to cause some of the plaintiffs to entertain thoughts of adopting force or criminal methods in self protection.

Chief Justice Marshall found in the List case that the only indication of an effort on the part of the Tobacco Association to establish a fixed standard of price was in the storage of tobacco beyond the year of its production and finally the court says, on page 384:

"We therefore agree with the trial court that there is *no evidence of price fixing or other unlawful manipulation of normal conditions* of supply and demand."

A matter of interest in connection with this case is the fact that Judge Jones, while concurring in the judgment said he concurred:

"Solely because the State Co-operative Statute permits such an agreement, and to that extent renders the Ohio Valentine Act ineffective as to persons coming within the provisions of the Co-operative laws."

From the cases referred to above and by their proper application to the evidence in this case, the court holds that corporations and individuals engaged in the same business of distributing a commodity to the public, have the right to combine in an organization or association reasonably to promote the best interests of its members, to discuss all things affecting the interests of its members, as well as the interests of the consumers of the commodity, and among other things the members may meet to discuss prices, but they do not have the right to restrain trade unreasonably to the prejudice of the public by adopting as a coercive weapon a business method which will have the inevitable effect of raising the cost of the commodity to the distributor and thus unreasonably limit or restrict competition and indirectly force an increase in the price of the commodity to the consumer.

The circumstances and conditions under which the

Milk Council adopted the free bottle plan and the Telling Company put it into effect makes the acts unlawful in that they restricted free competition and unreasonably restrained trade. An unlawful purpose may not be accomplished by lawful means, nor may a lawful purpose be accomplished by unlawful means. *Duplex Printing Press Co.* v. *Deering et al.,* 254 U. S., 443.

Conditions in the milk industry in Cleveland, which have been described as chaotic and deplorable are but typical of conditions affecting the prices of all commodities throughout the world. During the last two years we have seen that executive orders, legislative enactments and judicial decrees have had but little effect on causes deeply rooted in the natural laws of supply and demand. But while courts of equity should not indulge in judicial legislation directed at the removal of causes they always have had the power in times of stress to grant equitable relief for those victims of unfair competition who have no adequate remedy at law.

Having read many decisions disclosing the great erudition of those who wrote them, we turn back to the sound political philosophy of Adam Smith who published his "Wealth of Nations" in 1776. He says:

"The quantity of every commodity brought to market naturally suits itself to the effectual demand. It is the interest of all those who employ their land, labor, or stock, in bringing any commodity to market, that the quantity never should exceed the effectual demand; *and it is the interest of all other people that it never should fall short of that demand.*"

And the following philosophy seems to be as true today as it was when written over one hundred and fifty years ago:

"People of the same trade seldom meet together, even for merriment and diversion, but that the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."

A decree will be entered for the plaintiffs against all defendants except the one dismissed on motion, and a journal entry may be prepared in accordance with this opinion.