# BOARD OF TRADE OF THE CITY OF CHICAGO ET AL. *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 98. Argued December 18, 19, 1917.—Decided March 4, 1918.

The "Call" rule of the Board of Trade of Chicago, prohibiting members of the Board from purchasing or offering to purchase, during the period between the session of the Board termed the "Call" and the opening of the regular session of the next business day, grain "to arrive," at a price other than the closing bid at the "Call," does not violate the Anti-Trust Law.

A rule or agreement by which men occupying strong positions in a branch of trade fix prices at which they will buy or sell during an important part of the business day is not necessarily an illegal restraint of trade under the Anti-Trust Law.

Every agreement concerning or regulating trade restrains; and the true test of legality is whether the restraint is such as merely regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress or even destroy competition.

To determine this question, the court must ordinarily consider the facts peculiar to the business, its condition before and after the restraint was imposed, the nature of the restraint and its effect, actual or probable.

The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts, not because a good intention will save an otherwise objectionable regulation or the reverse, but because knowledge of intent may help the court to interpret facts and predict consequences.

It was therefore error for the District Court to strike from the answer in this case allegations concerning the history and purpose of the "Call" rule and to exclude evidence on that subject.

The rule of the Board of Trade here involved by nature is a restriction merely upon the period of price making; in scope it applies during a small part only of the business day, to a small part only of the grain shipped from day to day to Chicago, to an even smaller part of the day's sales, and not at all to grain shipped to any of numerous other

available markets; it has had no appreciable effect upon general market prices, nor has it materially affected the total volume of grain coming to Chicago, but, within the narrow limits of its operation, it has helped to improve market conditions in a number of ways. Reversed.

THE case is stated in the opinion.

*Mr. Henry S. Robbins* for appellants:

The Sherman Law does not condemn a resort to normal methods of commercial exchanges to promote business, and in determining these, all the facts and conditions existing at the time, as well as the intent and purpose of the parties, should.be considered.

This rule was but a.normal method of promoting the business of the exchange and the welfare of its members, and did not differ from other methods proper for exchanges to resort to, including that preventing members from trading with non-members, which has been sustained by this court. *Gladish* v. *Kansas City Exchange,* 113 Mo. App. 726; *Board of Trade* v. *Dickinson,* 114 Ill. App. 295; *State* v. *Duluth Board of Trade,* 107 Minnesota, 506; *State* v. *Milwaukee Chamber of Commerce,* 47 Wisconsin, 670; *Stovall* v. *McCutchen,* 107 Kentucky, 577; *Anderson* v. *United States,* 171 U. S. 604; *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600; *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 247.

The decree regulates intrastate trading. *Ware & Leland* v. *Mobile Co.,* 209 U. S. 405; *Engel* v. *O'Malley,* 219 U. S. 128.

*Mr. Assistant to the Attorney General Todd,* with whom *Mr. Lincoln R. Clark* was on the briefs, for the United States:

The intended effect of the regulation is to bind members of the Board to bid a uniform price in purchasing grain at country points, for Chicago delivery, between the close of

the "Call" and the opening of the regular session on the following day. The potency of members of the Board in the grain trade is reflexly shown by the primacy of the Board among grain markets of the world. Considering their influence, this agreement fixing the prices at which they would deal during an important part of each business day was an agreement in restraint of trade within the narrowest definition of the term. *United States v. United States Steel Corporation*, 223 Fed. Rep. 55, 155; *Standard Oil Co. v. United States*, 221 U. S. 1, 56, 59. There is a complete analogy in principle between the present case and *Swift & Co. v. United States*, 196 U. S. 375, where it was held that an agreement of packers not to bid against each other in the purchase of cattle violates the Anti-Trust Law. The members of the Board agreed not to bid against each other in the purchase of grain at country points.

It is of no legal consequence that the restriction operates only during the afternoon. If such a restriction may be imposed in the afternoon, why may it not be imposed in the morning? Counsel for the Board was at pains to bring out that the rule did not in the slightest affect the price at which the owners of wheat in Chicago elevators could sell. This but emphasizes the illegality of the restriction. Why make a difference between buying wheat in the afternoon from elevators in Chicago and buying wheat in the afternoon at country points for subsequent delivery in Chicago? Why should sellers of wheat in Chicago enjoy a competitive market in the afternoon while sellers of wheat at country points are denied one?

Where, as here, the necessary effect of an agreement or combination is unduly to restrict competitive conditions, the purpose or intention of the parties is immaterial. Agreements or combinations producing that effect are prohibited by the Act of Congress; and on the most elementary principles a transaction which the law prohibits is not made lawful by an innocent motive or pur-

pose. *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 341; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, 234, 243; *Swift & Co.* v. *United States*, 196 U. S. 375, 396. The intent to violate the law implied from doing what the law prohibits renders immaterial every other intent, purpose, or motive. Bishop, New Criminal Law, § 343; Holmes, The Common Law, p. 52.

In *Thomsen* v *Cayser*, 243 U. S. 66, 86, after hearing "the good intention of the parties, and, it may be, some good results," once more put forward as a defense under the Anti-Trust Law, this court disposed of the contention in language which should be final.

As a matter of fact, however, with a single exception, none of the benefits claimed is attributable to the particular provision of the rule which the Government is attacking, i. e., the price-fixing restriction.

The claim that the rule enabled the grain merchants of Chicago "to work upon a closer margin of profit" doubtless has reference to the supposed advantage of a fixed price. This is the one exception to the statement that all the benefits claimed for the rule are referable to some other provision than the one under attack. And here, of course, the answer is that however beneficial a fixed price might be according to the point of view of the Board, Congress has proceeded on a different economic theory.

The proposition that the Board might lawfully have prohibited *all* trading between its members after a certain hour is mere assertion, unsupported either by reason or authority. Nor does the proposition that the Board could prohibit altogether trading between members and non-members rest upon any stronger foundation. *Anderson* v. *United States*, 171 U. S. 604, supports no such proposition.

Even should this court agree with the hypothetical premise that the Board could have prohibited *all* trading by members after exchange hours, or *all* trading with

non-members, it would still not follow that the Board, as a condition of withholding. such prohibition, could prescribe the prices at which members should buy or sell..

Again, it is said that the restriction of competition caused by the rule was only incidental and "too small to be taken into account." The short answer is that the restriction was not "incidental"; it was direct and deliberate—the defendants "intended to make the very combination and agreement which they in fact did make." *Addyston Pipe Co.* v. *United States,* 175 U. S. 211, 243. Moreover, the restriction, besides being direct and deliberately imposed, was drastic; it interposed an absolute barrier against free agency in price-making at all times when the Board was not in session. The volume of business affected was also substantial.

The transactions actually were in large measure of interstate character. And, regardless of this character, the rule and the concerted action under it directly restrained an actual current of interstate commerce consisting of the grain moving from States other than Illinois to the Chicago market, by precluding members of the Board from competing with each other in the purchase of such grain after exchange hours. *Loewe* v. *Lawlor*, 208 U. S. 274; *Temple Iron Co.* v. *United States (United States* v. *Reading Co.)*, 226 U. S. 324, 357–358. The case is like *United States* v. *Patten (Cotton Corner Case)*, 226 U. S. 525, 543–544.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

Chicago is the leading grain market in the world. Its Board of Trade is the commercial center through which most of the trading in grain is done. The character of the organization is described in *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236. Its 1600 members include brokers, commission merchants, dealers, millers,.

maltsters, manufacturers of corn products and proprietors of elevators. Grains there dealt in are graded according to kind and quality and are sold usually "Chicago weight, inspection and delivery." The standard forms of trading are: (*a*) Spot sales; that is, sales of grain already in Chicago in railroad cars or elevators for immediate delivery by order on carrier or transfer of warehouse receipt. (*b*) Future sales; that is, agreements for delivery later in the current or in some future month. (*c*) Sales "to arrive"; that is, agreements to deliver on arrival grain which is already in transit to Chicago or is to be shipped there within a time specified. On every business day sessions of the Board are held at which all bids and sales are publicly made. Spot sales and future sales are made at the regular sessions of the Board from 9.30 A. M. to 1.15 P. M., except on Saturdays, when the session closes at 12 M. Special sessions, termed the "Call," are held immediately after the close of the regular session, at which sales "to arrive" are made. These sessions are not limited as to duration, but last usually about half an hour. At all these sessions transactions are between members only; but they may trade either for themselves or on behalf of others. Members may also trade privately with one another at any place, either during the sessions or after, and they may trade with non-members at any time except on the premises occupied by the Board.[1]

Purchases of grain "to arrive" are made largely from country dealers and farmers throughout the whole territory tributary to Chicago, which includes besides Illinois and Iowa, Indiana, Ohio, Wisconsin, Minnesota, Missouri, Kansas, Nebraska, and even South and North Dakota. The purchases are sometimes the result of bids to individual country dealers made by telegraph or telephone either during the sessions or after; but most pur-

---

[1] There is an exception as to future sales not here material.

chases are made by the sending out from Chicago by the afternoon mails to hundreds of country dealers offers to buy, at the prices named, any number of carloads, subject to acceptance before 9.30 A. M. on the next business day.

In 1906 the Board adopted what is known as the "Call" rule. By it members were prohibited from purchasing or offering to purchase, during the period between the close of the Call and the opening of the session on the next business day, any wheat, corn, oats or rye "to arrive" at a price other than the closing bid at the Call. The. Call was over, with rare exceptions, by two o'clock. The change effected was this: Before the adoption of the rule, members fixed their bids throughout the day at such prices as they respectively saw fit; after the adoption of the rule, the bids had to be fixed at the day's closing bid on the Call until the opening of the next session.

In 1913 the United States filed in the District Court for the Northern District of Illinois this suit against the Board and its executive officers and directors, to enjoin the enforcement of the Call rule, alleging it to be in violation of the Anti-Trust Law (July 2, 1890, c. 647, 26 Stat. 209). The defendants admitted the adoption and enforcement of the Call rule, and averred that its purpose was not to prevent competition or to control prices, but to promote the convenience of members by restricting their hours of business and to break up a monopoly in that branch of the grain trade acquired by four or five warehousemen in Chicago. On motion of the Government the allegations concerning the purpose of establishing the regulation were stricken from the record. The case was then heard upon evidence; and a decree was entered which declared that defendants became parties to a combination or conspiracy to restrain interstate and foreign trade and commerce "by adopting, acting upon and enforcing" the "Call" rule; and enjoined them from act-

ing upon the same or from adopting or acting upon any similar rule.

No opinion was delivered by the District Judge. The Government proved the existence of the rule and described its application and the change in business practice involved. It made no attempt to show that the rule was designed to or that it had the effect of limiting the amount of grain shipped to Chicago; or of retarding or accelerating shipment; or of raising or depressing prices; or of discriminating against any part of the public; or that it resulted in hardship to anyone. The case was rested upon the bald proposition, that a rule or agreement by which men occupying positions of strength in any branch of trade, fixed prices at which they would buy or sell during an important part of the business day, is an illegal restraint of trade under the Anti-Trust Law. But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences. The District Court erred, therefore, in striking from the answer

allegations concerning the history and purpose of the
Call rule and in later excluding evidence on that subject.
But the evidence admitted makes it clear that the rule
was a reasonable regulation of business consistent with
the provisions of the Anti-Trust Law.

*First:* The nature of the rule: The restriction was upon
the period of price-making. It required members to de-
sist from further price-making after the close of the Call
until 9.30 A. M. the next business day: but there was no
restriction upon the sending out of bids after close of the
Call. Thus it required members who desired to buy grain
"to arrive" to make up their minds before the close of
the Call how much they were willing to pay during the
interval before the next session of the Board. The rule
made it to their interest to attend the Call; and if they
did not fill their wants by purchases there, to make the
final bid high enough to enable them to purchase from
country dealers.

*Second:* The scope of the rule: It is restricted in opera-
tion to grain "to arrive." It applies only to a small part
of the grain shipped from day to day to Chicago, and to
an even smaller part of the day's sales: members were
left free to purchase grain already in Chicago from any-
one at any price throughout the day. It applies only
during a small part of the business day; members were
left free to purchase during the sessions of the Board
grain "to arrive," at any price, from members anywhere
and from non-members anywhere except on the premises
of the Board. It applied only to grain shipped to Chi-
cago: members were left free to purchase at any price
throughout the day from either members or non-members,
grain "to arrive" at any other market. Country dealers
and farmers had available in practically every part of the
territory called tributary to Chicago some other market
for grain "to arrive." Thus Missouri, Kansas, Nebraska,
and parts of Illinois are also tributary to St. Louis; Ne-

braska and Iowa, to Omaha; Minnesota, Iowa, South and North Dakota, to Minneapolis or Duluth; Wisconsin and parts of Iowa and of Illinois, to Milwaukee; Ohio, Indiana and parts of Illinois, to Cincinnati; Indiana and parts of Illinois, to Louisville.

*Third:* The effects of the rule: As it applies to only a small part of the grain shipped to Chicago and to that only during a part of the business day and does not apply at all to grain shipped to other markets, the rule had no appreciable effect on .general market prices; nor did it materially affect the total volume of grain coming to Chicago. But within the narrow limits of its operation the rule helped.to improve market conditions thus:

(*a*) It created a public market for grain "to arrive." Before its adoption, bids were made privately. Men had to·buy and sell without adequate knowledge of actual market conditions. This was disadvantageous to all concerned, but particularly so to country dealers and farmers.

(*b*) It brought into the regular market hours of the Board sessions more of the trading in grain "to arrive."

(*c*) It brought buyers and sellers into more direct relations; because on the Call they gathered together for a free and open interchange of bids and offers.

(*d*) It distributed the business in grain "to arrive" among a far larger number of Chicago receivers and commission merchants than had been the case there before.

(*e*) It increased the number of country dealers engaging in this branch of the business; supplied them more regularly with bids from Chicago; and also increased the number of bids received by them from competing markets.

(*f*) It eliminated risks necessarily incident to a private market, and thus enabled country dealers.to do business on a smaller margin. In that way the rule made it possible for them to pay more to farmers without raising the price to consumers.

(*g*) It enabled country dealers to sell some grain to arrive which they would otherwise have been obliged either to ship to Chicago commission merchants or to sell for "future delivery."

(*h*) It enabled those grain merchants of Chicago who sell to millers and exporters to trade on a smaller margin and, by paying more for grain or selling it for less, to make the Chicago market more attractive for both shippers and buyers of grain.

(*i*) Incidentally it facilitated trading "to arrive" by enabling those engaged in these transactions to fulfil their contracts by tendering grain arriving at Chicago on any railroad, whereas formerly shipments had to be made over the particular railroad designated by the buyer.

The restraint imposed by the rule is less severe than that sustained in *Anderson* v. *United States*, 171 U. S. 604. Every board of trade and nearly every trade organization imposes some restraint upon the conduct of business by its members. Those relating to the hours in which business may be done are common; and they make a special appeal where, as here, they tend to shorten the working day or, at least, limit the period of most exacting activity. The decree of the District Court is reversed with directions to dismiss the bill.

*Reversed.*


MR. JUSTICE McREYNOLDS took no part in the consideration or decision of this case.