## UNITED STATES v. SWIFT & CO. et al.

### No. 9513.

District Court, D. Colorado, at Denver.
Sept. 8, 1942.

Thurman Arnold, Asst. Atty. Gen., of Washington, D. C., and Thomas J. Morrissey, U. S. Atty., James McI. Henderson, and George B. Haddock, Sp. Assts. to Atty. Gen., and Sheridan Morgan, E. Compton Timberlake, and Joseph J. Cella, Jr., Sp. Attys., all of Denver, Colo., for the United States.

Van Cise & Robinson, of Denver, Colo., for Swift & Co., John Holmes, Paul C. Smith, and S. M. Weir.

R. F. Feagens, of Chicago, Ill., and John R. Coen, of Denver, Colo., for Armour & Co., George A. Eastwood, Walter A. Netsch, and Thomas J. Tynan.

Robert G. Bosworth and C. C. Dawson, Jr., both of Denver, Colo., for Denver Union Stock Yard Co., J. A. Shoemaker, and L. M. Pexton.

Silverstein & Silverstein, of Denver, Colo., for Denver Live Stock Exchange, Denver Sub-Committee of the Joint Marketing Improvement Committee, Associated Live Stock Commission Firms, A. A. Blakley Live Stock Commission Company, Hinie Klecker, Denver Live Stock Commission Company, Drinkard & Emmert, Inc., Mike Hayes, A. A. Blakley, Louis J. Reed, Milton M. Mann, Andrew K. Miller, Russell Wilkins, J. J. Drinkard, Charles G. Smith, Ralph B. Herrick, Ralph S. Blakley, J. D. McKee, and William H. Hilbert.

Grant, Shafroth & Toll, of Denver, Colo., for Cudahy Packing Co., G. E. Robertson, and G. R. Clark.

SYMES, District Judge.

I have paid unusual attention to the arguments of counsel, engaging in considerable colloquy with them in an attempt to find out the basic issues of the case, to see if I could decide the demurrers and motions at the conclusion of the argument. I also read last night a good many of the authorities cited in the briefs, and have reached certain definite conclusions as to the law.

The government's contention is briefly set forth on page 25 of their brief, where they state: "The gist of the charge is that the defendants who control a major part of the purchase and sale of fat lambs at the central marketing point have agreed with one another that they will no longer purchase at or near the points of production, but will confine their purchasing to the central market. The question then is narrowed to whether or not a group of purchasers and others interested in the advancement of the Denver central market can agree among themselves to refrain from one type of marketing and to deal exclusively by means of another type of marketing. Whether the conspirators thus can by agreement deprive the purchasers of the right to choose whichever method of distribution they may seek, and to deprive the producers and sellers of the right to market through any channel other than the central market."

It has developed in the course of the argument that the defendants are all purchasers at various times of fat lambs, of which over a million and a half are produced in Colorado annually and marketed; that there have been in the past two methods of marketing these lambs: First, by the purchasers, those desiring to purchase fat lambs, sending their salesmen into the field, that is, around to the farm where the fat lambs are produced, and making their purchases, or waiting until the lambs come into the Denver Union Stock Yards where they are sold.

The gist of the complaint is really that these dealers, Swift & Company, and Armour, and Cudahy, and others, have agreed among themselves that they will in the future confine their purchases of lambs solely to the Denver Union Stock Yards' stock yards, and that they will refrain from purchasing fat lambs in the field.

It is claimed that such an agreement by these defendants, who are the largest purchasers of this class of live stock, constitutes a monopoly in restraint of trade and in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

An examination of the indictment discloses that there is no claim that by this practice the price of fat lambs on the Denver market or elsewhere has been in any way affected, or that any monopoly, except in the second count of the indictment, has been created, or that this practice has in any way affected the price of lambs or the flow of fat lambs into this or any other market anywhere in the United States, or has affected the number of lambs produced for sale in any way.

850

The government contends in effect that the sellers of lambs, that is, the producers, by this action have been deprived of the opportunity to choose between disposing of their product by so-called country buying, and are compelled, if they want to market their lambs, to send them to the Denver Stock Yards. The Denver Stock Yards has been classed by the Supreme Court in the Stafford case (Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229) as "a great public utility" designed and conducted for the purpose of affording a channel or means by which the producers of live stock in the West and Southwest can readily dispose of their product. The Court takes judicial notice of the fact that by the law the government has regulated the conduct of these live stock markets so that the seller or farmer who ships his live stock there sells in a supervised market where his stock is honestly weighed, the proceeds accounted for, and the charges regulated, and the whole sales procedure supervised by the government in accordance with the Stock Yards Act, 7 U.S.C.A. § 181 et seq. I fail to see how it can be said that such a practice in any way affects or burdens interstate commerce without the government going further and charging that the price to the ultimate consumer is affected, or that the amount of fat lambs raised or produced, or flowing in interstate commerce is lessened in any way. There is no claim that the prices are fixed, or that the producer gets a less price by selling on the Denver market than he would if the defendants purchased under the country system of buying. The government claims that these defendants have in the past set up a practice for buying lambs which amounts to no more than a regulation of their own method of doing business. Why have they not the right to desist from that method and confine themselves solely to supplying their wants by buying at the public utility market supervised by the government and run for the advantage of the producer?

A very similar case on the facts is the Chicago Board of Trade case (Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 244, 62 L.Ed. 683), where the Supreme Court held that it was not a violation of the Sherman Act for the Board of Trade to forbid its members from purchasing or offering to purchase grain during the period between two sessions of the Board, that is, between the adjournment of the Board of Trade in the afternoon and the opening of the market in the morning, at a price other than the closing bid when the market closed the previous afternoon. They further held that a rule or agreement by which men situated as these defendants are, occupying a strong position in a branch of trade, fix the prices at which they will buy or sell during the important part of the business day, is not necessarily an illegal restraint of trade. As the Court there points out: "Every agreement concerning or regulating trade restrains" to a certain extent; "and the true test of legality is whether the restraint is such as merely regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress or even destroy competition."

In the case at bar there is no claim that competition is affected, because the defendants, when they buy lambs in the Denver market, actually compete with each other and other buyers, and the producer has the advantage of that competition which he does not have when dealing with a single salesman at his farm.

In this Board of Trade case, 246 U.S. 231, 38 S.Ct. 242, 245, 62 L.Ed. 683, Mr. Justice Brandeis, speaking for the court, laid down certain tests and pointed out certain advantages of the public market over the other plan, which are applicable here. It brings more live stock onto the Denver market, which naturally enhances competition, and brings the buyers and sellers in more direct relations, increases the number of bids received, and eliminates many risks incident to private marketing, such as the expense of sending salesmen out, which eventually must be saddled, of course, to the cost to the public, and, as Judge Brandeis points out, it enables the producer who ships to Denver to trade on a smaller margin, and to obtain more for his product than if he sells in the country. The Court then observed in conclusion that "Every Board of Trade and nearly every trade organization imposes some restraint upon the conduct of business by its members," such as those relating to the hours in which business is done and other restrictions.

In the Hopkins case (Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290), the Supreme Court upheld the organization of the Kansas City Live Stock Exchange and a rule forbidding members

of the association to buy live stock from a commission merchant in Kansas City who was not a member of the Exchange. In that connection it is admitted at the bar that there is no restriction at all at the Denver Union Stock Yards as to who may buy and sell live stock. Anybody can, whether he is a member of the Exchange or not, buy and sell live stock, offer stock for sale or sell his own, and the case also held the Exchange may fix the commission for selling live stock, prohibit the employment of agents to solicit consignments except upon a stipulated salary, and make other regulations for the proper conduct of the business, and, as the Court there observed at page 592 of 171 U.S., at page 45 of 19 S.Ct., 43 L.Ed. 290: "To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce, in order to come within the act."

It is difficult to imagine here any direct result to interstate commerce from the requirement that all fat lambs sold in Colorado be shipped to the Denver union market, or to the flow of fat lambs in interstate commerce from Colorado to other points outside the state, especially where no restraint is alleged or attempt made to restrain any outsider from conducting the kind of business that the government seems to want conducted, that is, direct buying in the country, if anyone cares to carry on that business.

There is also a total failure in the indictment to allege any coercion or the results of any coercion, or the effects of the rule upon the members of the Exchange. Probably they could be deprived of their membership, but what of it? There is no showing and it is admitted that the Exchange has no power to impose penalties upon a member who violates the rule in question, and it is easy to see that they have no power over them, because, as admitted by the government, a member, upon being expelled, could still go to the stock yards and buy fat lambs in the same manner as he did before, the only difference being that he might suffer some social ostracising by his fellow members if he did, and, as the Court said in the Hopkins case on page 594 of 171 U.S., on page 46 of 19 S.Ct., 43

L.Ed. 290: "An agreement may in a variety of ways affect interstate commerce, just as state legislation may, and yet like it be entirely valid because the interference produced by the agreement or by the legislation is not direct." The Court then points out many instances of that nature.

Immediately following the Hopkins case, in the same volume at page 604 is the Anderson Case (Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43. L.Ed. 300), which dealt with the Traders' Live Stock Exchange in Kansas City, and a somewhat similar case as the Hopkins case just referred to, except that the defendants are themselves the purchasers of cattle, and not brokers or commission men. It is stated by Mr. Justice Peckham on page 612 of 171 U.S., on page 52 of 19 S.Ct., 43 L.Ed. 300—the situation is analogous to that of the case at bar because, as he stated there, there is no evidence or charge that the defendants "have done anything other than to form this exchange and adopt and enforce the rules mentioned above, and the question is whether by their adoption, and by peacefully carrying them out, without threats and without violence, but by the mere refusal to do business with those who will not respect their rules, there is a violation of the federal statute," and the Court held that there was not.

Likewise in the case at bar, as the Court said (Anderson case, page 612 of 171 U.S., page 53 of 19 S.Ct., 43 L.Ed. 300): "There is no evidence [or charge] that these defendants have in any manner other than by the rules above mentioned hindered or impeded others in shipping, trading, or selling their stock, or that they have in any way interfered with the freedom of access to the stock yards of any and all other traders and purchasers, or hindered their obtaining the same facilities which were therein afforded by the stock yards." There is no charge in the indictment here that the acts of the defendants in any way lessened the amount of the trade either through the Denver Stock Yards market or in the fat lamb business in Colorado or elsewhere as a whole, or harmed any producer.

As pointed out this morning by counsel, the Apex Hosiery case in 310 U.S. (Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044) was a review or summation by Justice Stone of the whole theory and application of the Sherman Anti-Trust Act.

852

The Court said there, at page 493 of 310 U.S., at page 992 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044: "The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury."

There is nothing in this indictment in the case at bar to bring it within that language. And then Judge Stone says, at page 495 of 310 U.S., at page 993 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044: "This Court has never applied the Sherman Act in any case * * * unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services."

As I have already pointed out, there is no charge in this indictment of any interference with commercial transactions or business in the marketing of goods and services. It is not claimed that the supply of fat lambs or their movement is in any way affected or the prices raised or affected in any manner by the acts complained of. Furthermore, the agreement of these defendants was nothing more than a self-imposed rule of the manner of conducting their own individual business; that is, that they would not engage in country buying, something that separately they had the right to do, as admitted by counsel. The mere fact that they agreed to comply with the rule of their own exchange forbidding country buying, without further allegations of its adverse effects in the way of creating restraint of trade, or affecting the price of fat lambs, or limiting production, falls short of coming within the provisions of the act as interpreted by the Supreme Court.

In the case of Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608, the agreement complained of prevented the dealer in tiles in San Francisco, who was not a member of the association, from purchasing or procuring the same upon any terms from members of the association. That case went on the question of whether it was in interstate commerce.

In conclusion, therefore, it seems to the Court that the indictment is defective in that it does not go far enough in its charges to bring the agreement within any of the recognized canons of construction of the Sherman Anti-Trust Act, because, as stated before, there is no allegation that the defendants intended to or in any way harmed anyone or affected the price of fat lambs, the amount of them that could be sold, or the places where they could be sold. The net result was nothing more than a mere regulation by an association of the conduct of its members, which has been recognized as lawful.

We have gone along with the government on all of its indictments to date, recognizing that under recent decisions of the Supreme Court the full extent of the Sherman Act has not been explored. We think here, however, the government has gone beyond the extent and meaning of that law as interpreted by the Supreme Court, for, as stated, there is no allegation that anyone has been injured or the flow of interstate commerce in any way affected. The indictment merely alleges an agreement to follow a rule promulgated by the live stock exchange, and nothing more.

It follows from this that the demurrers are sustained, and the indictment as to all the defendants is dismissed.