UNITED STATES of America, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Losor Chevrolet Dealers Association, Dealers' Service, Inc., and Foothill Chevrolet Dealers Association, Defendants.

No. 62–1208.

United States District Court
S. D. California.

Aug. 24, 1964.

Maxwell M. Blecher and Robert C. Weinbaum, Attys., Antitrust Div., Dept. of Justice, Los Angeles, Cal., for plaintiff.

Hansen & Dolle, by Victor R. Hansen, Gary B. Lovell, and Glenn S. Roberts, Los Angeles, Cal., for defendants.

O'Melveny & Myers, by Homer I. Mitchell, Lawler, Felix & Hall, by Marcus Mattson, J. Phillip Nevins, Los Angeles, Cal., for defendant, General Motors Corp.

CARR, District Judge.

The government by this suit seeks to have the court decree that the defendants have engaged in a combination and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act. It then seeks to enjoin each of the defendants from carrying on the alleged combination and conspiracy and, in particular, it requests that General Motors be perpetually enjoined from imposing or attempting to impose any limitation or restriction upon any General Motors dealers in dealing with discount houses. It is also sought to enjoin General Motors from inducing, persuading, or attempting to persuade any General Motors dealer to refrain from dealing with discount houses. The prayer of the complaint further seeks to enjoin General Motors from controlling or attempting to control prices at which any dealer may sell automobiles and from attempting to exercise any restraint on the resale of automobiles by any dealer.

General Motors selects, and contracts with, various parties to carry on dealerships for Chevrolet automobiles. These contracts provide among other things for the nonexclusive privilege of selling Chevrolet automobiles, parts, and accessories; and, although a dealer is assigned to a particular area, he may sell Chevrolet automobiles anywhere he finds a customer. The contract provides that the selling agreement is a personal service contract and that the dealer shall actively, aggressively, and honestly promote the sale of Chevrolet automobiles, parts, and accessories, also that he shall conduct his business in a manner which will preserve the goodwill of Chevrolet. It is further provided that the dealer "shall establish a place of business at a location mutually satisfactory to the dealer and General Motors and shall not establish a branch sales office without prior written approval of Chevrolet." The dealer is also required to maintain an approved business location not only for sales but for service operations and "parts and accessory sales."

As early as 1960, complaints were beginning to reach General Motors to the effect that discount houses were selling Chevrolet automobiles in the Los Angeles metropolitan area, the area involved in this suit. Letters and some telegrams were received from dealers and their salesmen complaining of sales through discount houses. General Motors became seriously concerned with the matter of referral sales by discount houses in the latter part of 1960 and began to take steps looking toward the termination of the referral sales by discount houses. Losor, a trade association whose membership consisted of Chevrolet dealers, about June 28, 1960, took notice of the discount house situation and began efforts to induce General Motors to take some action respecting the matter. At a later time, about December 15, 1960, there was a meeting of the three dealer associations, namely: Losor, Dealers Service, Inc., and Foothill Dealers Association, which were all comprised of Chevrolet dealers in the metropolitan area. All of these organizations were interested in persuading General Motors to bring about a termination of referral sales by discount houses. In the meantime and prior to the meeting of the three associations, General Motors had undertaken through its representatives to advise the various Chevrolet dealers that it considered the discount referral transactions to be contrary to the dealer selling agreements. When the dealers were contacted and the matter discussed, they indicated that they would discontinue the use of the discount houses for referral sales. In several instances where purchases of Chevrolet cars had been made by representatives of one of the dealer associations, the dealer refunded the purchase price and took back the Chevrolet automobile. The dealer organizations insist that their representatives made these purchases for the purpose of convincing General Motors that referral sales were being made by discount houses. The dealer associations supplied the representatives of General Motors with the name of the dealer and

the record of the sale which had been made.

The government contends that because the dealer associations endeavored to persuade General Motors that the discount house referral sales were detrimental to the dealers and General Motors undertook to terminate the referral sales by the discount houses there came into existence a combination and conspiracy in restraint of trade. The government contends that the activities amounted to a boycott and that, being a boycott, it is *per se* a violation. The contention appears to rest upon the premises that the effort to eliminate referral sales by discount houses was, in fact, directed at price control. In some instances some of the complaining salesmen, and in one or two instances a dealer, complained in telegrams and letters regarding the "cut-rate" or "discount price" of the discount houses. The evidence in the record, however, does not indicate that General Motors at any time was concerned regarding the price at which Chevrolet automobiles were sold since any dealer could sell at any price he desired and at any place.

It is the position of General Motors that its dealer contracts prohibit the establishment of an additional dealership or branch and that to permit the establishment of such would be extremely detrimental not only to their method of distribution through dealerships but that their entire program of distribution would be completely destroyed. In this, it is contended that an important part of the system encompasses the product loyalty of the dealership, the facilities for parts and services, the capacity to comply with warranties and many other services that are afforded by Chevrolet dealerships but are not available at discount houses. It is also important to note that discount houses sell more than one make of automobile and necessarily are interested in the sale rather than promoting one particular make.

The government appeared to concede during the trial, although apparently now contending otherwise, that General Motors by reason of its contractual rights could have prevented the activity of the discount houses in the beginning but that, having endeavored to induce the Chevrolet dealers to take action, a combination and conspiracy evolved by reason of the at least tacit agreement of the Chevrolet dealers to refrain from doing business with discount houses. General Motors, on the other hand, contends that it has the legal right to require a dealer to operate from his established dealership and not to use discount houses; that General Motors in endeavoring to persuade dealers to comply with this contract was acting unilaterally and without any agreement or understanding with the dealers; and that merely because General Motors and the dealers associations may have had the same objective in mind it does not follow that a combination and conspiracy came into being. To hold that parallel action or the same objective pursued by different parties necessarily establishes a combination and conspiracy, would preclude many ordinary business activities. Here it must be assumed that General Motors distributor contracts are legal and in and of themselves in no way in violation of the Sherman Act. As heretofore pointed out, the Chevrolet dealers are free to sell at any price, to anyone, at any time. They are, however, required to maintain an established place of business which meets certain requirements of the dealership contract. Chevrolet dealers are required to make periodic reports to General Motors and to carry on business in accordance with established standards which are applicable to Chevrolet dealers generally. Maintenance of sales facilities, service facilities, inventory of parts, and many other matters directly affecting the distribution of Chevrolet automobiles are prescribed by the dealership contract. It is contended that the dealership relationship with customers is one of the important phases of the system and that without it the business of General Motors would suffer materially. In this connection, it is pointed out that where a referral sale is made through a discount house, although the warranty provisions re-

lating to the car require any dealer to provide service pursuant to those warranties, the dealers generally would show little or no interest in satisfying the warranty conditions.

It is emphasized that the location of dealers is of great importance since persons requiring service usually desire to go to a dealership as near as possible to their home or business and if the dealers were not strategically located the purchasing public would be greatly inconvenienced in obtaining service at Chevrolet dealers as well as genuine Chevrolet parts.

The evidence indicates that General Motors relies heavily upon the information received from its dealers in scheduling production programs. The information received from its dealers helps make it possible to plan its production which is done far in advance of the release of the new models each year.

■ From the facts of this case, it appears that General Motors is seeking to enforce a contractual obligation with its Chevrolet franchise dealers. While those agreements make many requirements of the dealers they do not limit competition among the dealers. All dealers are free to sell at any price, even at a loss, if they desire, and they may compete with other dealers in that dealer's area. The evidence clearly discloses that Chevrolet dealers are in vigorous competition with each other in discounting the prices in the sale of Chevrolets. To insist that a manufacturer and distributor of automobiles is not permitted to select and set up standards for the operation of his dealers upon the theory that it was an unreasonable restraint of competition would result not only in the destruction of the competition which benefits the public but would probably eliminate the distributor system entirely. Without such a system it would no doubt be impossible for a large manufacturer to plan its program for new cars each year which entails preparation and planning far beyond the concept of a person not familiar with the business. If Chicago Board of Trade v. United States, 246 U.S. 231, 38

S.Ct. 242, 62 L.Ed. 683, means what it says, the test enunciated therein certainly applies in this case. Considering all of the factors encompassed in the relationship between General Motors and its franchise dealers and the public, it must be concluded that the dealer contracts promote rather than suppress competition and benefit the purchasing public. It is difficult to conclude that the exclusion of discount houses, who supply no facilities for repairs or the supply of genuine Chevrolet parts, or who fulfill warranty obligations, or who do anything, in fact, except offer for sale a Chevrolet automobile or a competing automobile if the customer indicates a preference, would constitute an unreasonable restraint of competition violative of the Sherman Act.

There is not too much conflict in the evidence respecting the alleged conspiracy. As heretofore noted, certain Chevrolet dealers and, in particular, Losor, began to call upon General Motors to bring about an end to the discount house operation. Thereafter, General Motors took more serious note of the situation and considered what could be done. Finally, General Motors took action and made it known through its representatives to Chevrolet dealers that the use of discount houses was, in its opinion, a violation of the Chevrolet franchise contracts. It was not until December 15, 1960, that the three Chevrolet organizations, Losor, D. S. I., and Foothill, began to meet for the purpose of encouraging General Motors to bring about a cessation of the discount house situation. After General Motors had make known its position, the Chevrolet dealers continued to make purchases through discount houses through shoppers and bring those transactions to the attention of officials of General Motors. When this was done, the dealer would usually refund the money and take back the car which had been sold. It is undoubtedly true that to some extent the general objective of General Motors and its dealers coincided, but General Motors was interested in maintaining and continuing its dis-

-tributor system through franchise deal-·ers and in the main the dealers were interested in preventing the referral sales of Chevrolets by discount houses, particularly since they were required to carry out all of the contract obligations to the purchasers of Chevrolet automobiles and in many instances maintain service departments at a financial loss. It may well have been that some of the individual dealers were complaining about the discount prices of the discount houses, but the evidence in the case does not support the conclusion that General Motors was endeavoring to maintain a price structure. Since General Motors was legally entitled to enforce its contracts, the mere urging of some of its dealers for assistance would not seem to change an independent action by General Motors into a combination or conspiracy. ·Conspiracy has become a catchall dragnet concept which becomes more and more ·expansive year by year. This tendency was commented upon in the case of Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, and, in particular, by Mr. Justice Jackson in a con-·curring opinion. To hold that a conspiracy arises, where a person is urged by other persons to exercise his legal rights and he does so, would preclude communication between business organizations. The government relies upon United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, but that case is wholly different from the case at bar.

The mere fact that General Motors brought about a result that was desired by some of the Chevrolet dealers is not sufficient to raise an inference of conspiracy. The circumstances in this case must be viewed in an environment of practicality and when that is done it is impossible for this court to conclude that a conspiracy existed. There was no reason to conspire to do what legally could be done.

Assuming that the court is correct in holding that General Motors has the legal power to enforce its dealership contracts and to preclude the use of discount houses by its dealers, it would be a useless act for the court to restrain General Motors or the dealer associations from conspiring, if there were in fact a conspiracy, when the court is actually deciding that General Motors has the legal right to do what it did and that the dealer associations had a right to urge General Motors to do what it did. A court of equity does not do a useless act.

The court concludes that the government has failed to produce proof to establish the allegations of its complaint and for the relief prayed for in its prayer. Judgment will be entered accordingly for the defendants.

Counsel for the defendants are directed to prepare proposed findings of fact and conclusions of law and decree pursuant to Local Rule 7.