GRIFFIN, Circuit Judge,
dissenting.
To succeed on a § 1 claim under the Sherman Antitrust Act, a plaintiff must establish that the defendants: “(1) participated in an agreement that (2) unreasonably restrained trade in the relevant market.” Worldwide Basketball and Sport Tours, Inc. v. NCAA, 388 F.3d 965, 959 (6th Cir.2004). Because § 1 “does not reach conduct that is wholly unilateral,” Copperweld Carp. v. Indep. Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (internal quotation marks omitted), proving the first element involves a threshold showing that the defendants are separate entities capable of concerted action. That is the only question before us: “whether defendants ... should be characterized as a single entity.” (Majority opinion.)
The test we apply to determine single-entity status is from American Needle and Copperweld: whether the defendants áre “separate economic actors pursuing separate economic interests,” such that their agreement ‘“deprives the marketplace of independent centers of decisionmaking,’ ... and thus of actual or potential competition.” Am. Needle, Inc. v. Nat’l Football *946 League, 560 U.S. 183, 195, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010) (quoting. Copperweld, 467 U.S. at 769, 104 S.Ct. 2731).
My colleagues begin not with American Needle and Copperweld, but with the “rule of reason” as articulated in Board of Trade of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) — a test that may come into play only for the second part of the inquiry — i.e.,- in determining whether the agreement itself constitutes an “unreasonable restraint” on trade. See Am. Needle, 560 U.S. at 203, 130 S.Ct. 2201 (“[T]he restraint must be judged according to the flexible Rule of Reason.”) (footnote omitted); see also Worldwide Basketball, 388 F.3d at .959 (“Whether an agreement unreasonably restrains trade is determined under one of two approaches: the per se rule and the rale of reason.”).[1] Reaching this issue is premature. Because of its ruling that defendants are a single entity for § 1 purposes,' the district court never considered whether defendants “participated in [any] agreement,” much less an agreement to restrain trade unreasonably.
The majority’s misapplication of American Needle is problematic. Invoking the rule of reason steers focus to defendants’ intent to avoid competition with plaintiff and away ■ from the relevant question: whether, under, the terms of their Joint Operating Agreement (JOA), defendant hospitals and them joint operating company, Premier Health Partners (Premier), share “a complete unity of interest,” Copperweld, 467 U.S. at 771, 104 S.Ct. 2731, and represent a single center of decision-making. I conclude they do. Thus, I would affirm summary judgment in favor of defendants and respectfully dissent.
I.
“The Sherman Act contains a ‘basic distinction between concerted and independent action.’ ” Id. at 767, 104 S.Ct. 2731 (quoting Monsanto Co. v. Spray-Rite Serv. Corp,, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Section 2 of the Act governs conduct by a single firm that “threatens actual monopolization,” while § 1 reaches “unreasonable restraints of trade effected by a ‘contract, combination or ... conspiracy’ between separate entities.” Id. at 767-68, 104 S.Ct. 2731 (quoting 15 U.S.C. § 1). Concerted activity between two parties is “inherently ... fraught with anticompetitive risk.” Id. at 768-69, 104 S.Ct. 2731, “In any conspiracy, two or.more entities that previously pursued their own interests separately are combining to act as one for their common benefit.” Id. at 769, 104 S.Ct. 2731. As a result, the conspirators profit .from increased economic power, while depriving the market “of the independent , centers of decisionmaking that competition assumes and demands.” Id.
That concern does not apply, however, when the actors share “a complete unity of interest,” such as when the coordinated conduct occurs between officers and employees of the same company, or a corporation and one of its unincorporated divisions. Id. at 769-71, , 104 S.Ct. 2731. “[Officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.” Id. at 769, 104 S.Ct. 2731. Following this reasoning in Copper-weld, the Supreme Court held that the coordinated activity of a parent corpora *947 tion and its wholly owned subsidiary “must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.” Id. at 771, 104 S.Ct 2731.
Although Copperweld limited its inquiry to the context of parent and wholly owned subsidiary corporations, see id. at 767, 104 S.Ct. 2731, the Court emphasized “the broader principle that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1.” Id. at 773 n. 21,104 S.Ct. 2731. Whether two legally separate entities constitute a single actor depends upon commonality of interest, not corporate formality. Thus, “although a parent corporation and its wholly owned subsidiary are ‘separate’ for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they ..control a single aggregation of economic power. Joint conduct by two such entities does not ‘depriv[e] the marketplace of independent centers of decisionmaking.’ ” Am. Needle, 560 U.S. at 194, 130 S.Ct. 2201 (quoting Copperweld, 467 U.S. at 769, 104 S.Ct. 2731).
The Supreme Court reiterated the substance-over-form analysis' in American Needle, which involved an antitrust claim against National Football League Properties (NFLP), an organization formed by the 32 teams in the National Football League (NFL), “to develop, license, and market [each team’s] intellectual property.” 560 U.S. at 187,130 S.Ct; 2201. Traditionally, NFLP granted nonexclusive licenses to vendors, including American Needle, to manufacture and sell clothing bearing NFL team insignias. Id. In 2000, however, NFLP granted Reebok an exclusive license to sell trademarked headwear for all 32 teams. Id. American Needle sued, claiming the NFL, its teams, the NFLP, and Reebok violated §§ 1 and 2 of the Sherman Act. Id. at 187-88, 130 S.Ct. 2201. Defendants NFL and NFLP asserted they were incapable of conspiring with each other “because they are a single economic enterprise, at least with respect to the conduct challenged.” Id. at 188, 130 S.Ct. 2201. The district court agreed and granted defendants’ motion for summary judgment. The Seventh Circuit affirmed, noting the teams “can function only as one source of economic power when collectively producing NFL football.” Id.
The Supreme Court reversed. Explaining the single-entity inquiry, the Court stated:
[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the.question whether the parties involved “seem”, like one firm or multiple firms in any metaphysical sense. The key is whether the alleged “contract, combination ... or conspiracy” is concerted action — that is, whether it joins together separate deci-sionmakers. The relevant, inquiry, therefore, is whether there is a “contract, combination ... or conspiracy!’ amongst “separate economic actors pursuing .separate economic interests” ... such that the agreement “deprives the marketplace of independent centers of decisionmaking,” and therefore of “diversity of entrepreneurial interests,” and thus of actual or potential competition.
Id. at 195, 130 S.Ct. 2201 (citations omitted).
Applying this, test, the'Court ruled the independently owned NFL teams were capable of conspiring with one .another. Though “partially unite[d]” by the fact that they all benefit from the success of the NFL brand, each team “still ha[d] distinct, potentially competing interests.” Id. at 198,130 S.Ct. 2201. Teams compete with one another on- the field for fans, for contracts with managerial and player per *948 sonnel, and “in the market for intellectual property.” Id. at 196-97, 130 S.Ct. 2201. A team licensing its intellectual property “is not pursuing the common interests of the whole league but is instead pursuing interests of [the] ‘corporation itself,’... teams are acting as ‘separate economic actors pursuing separate economic interests,’ and each team therefore is a potential ‘independent cente[r] of decisionmak-ing.’ ” Id. at 197, 130 S.Ct. 2201 (quoting Copperweld, 467 U.S. at 770, 104 S.Ct. 2731) (citation omitted). The fact that the teams had formed the NFLP to riiarket their brands through a single outlet was not dispositive. “An ongoing § 1 violation cannot evade § Í simply by giving the ongoing violation a name and a label.” Id.
Whether the NFLP’s decisions constituted concerted action was a closer question. “This is so both because NFLP is a separate corporation with its own management and because the record indicates that most of the revenues generated by NFLP are shared by the teams on an equal basis.” Id. at 200, 130 S.Ct. 2201. Nevertheless, because each team acted for its own separate interest in making NFLP decisions, the Court held that those decisions fell within the reach of § 1. Id. “Thirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm’s profits.” Id. at 201, 130 S.Ct. 2201. Instead, each team garnered economic benefits “separate and apart from NFLP profits as a result of the decisions they make for the NFLP.” Id. Accordingly, because each team was acting for its own interest, and not simply the interest of the NFLP as a whole, “decisions by the NFLP regarding the teams’ separately owned intellectual property constitute^] concerted action.” Id.
II.
As the majority states, American Needle “eschewed formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticom-petitive conduct actually operate.” Am. Needle, 560 U.S. at 191, 130 S.Ct. 2201. Guided by the rule of reason, my colleagues interpret this directive to mean that we should ask how defendants “actually operate” with regard to plaintiff — specifically, their intent to keep plaintiff out of the market as expressed through apparent threats by Premier’s executives and the boycott defendants allegedly arranged among the insurance companies. This view is -flawed. Defendants’ intent to exclude others from the market is irrelevant to determining whether defendants themselves constitute a single entity. To resolve that question, we should consider how defendants “actually operate” amongst each other.
American Needle asks if “the [anticom-petitive] agreement joins together independent centers of decisionmaking” between the defendant entities. 560 U.S. at 196, 130- S.Ct. 2201 (internal quotation marks omitted). Defendant hospitals were independent centers of decisionmaking before forming Premier as their joint operating company, but the question here is whether that independence survived .the creation of the joint venture; whether, when acting through Premier, defendants are “pursuing the common interests of the whole,” or whether each defendant has a remaining, independent economic interest, such that it could be “pursuing the interests of [the] corporation itself,” even in the course of taking joint action. Id. at-197, 130 S.Ct. 2201 (internal quotation marks omitted). What matters then is whether defendants remain in competition with each other, not whether they intend to ward off competition with a third party. The Supreme Court’s reasoning makes this point plain:'
*949 Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself....
For that reason, decisions by the NFLP regarding, the teams’ separately owned intellectual property constitute concerted action. Thirty-two teams operating independently through the vehicle of the NFLP are not like components of a single firm that act to maximize the firm’s profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP’s financial well-being. Unlike typical decisions by corporate shareholders, NFLP licensing decisions effectively require the assent of more than a mere majority of shareholders. And each team’s decision reflects not only an interest in NFLP’s profits but also an interest in the team’s individual profits.
Id. at 200-01, 130 S.Ct. 2201 (citations and footnotes omitted). Defendants’ wish to avoid competing with plaintiff tells us nothing about whether defendant hospitals are themselves “potential competitors with economic interests that are distinct from [Premier’s] financial well-being” as a whole.
III.
The best evidence of how Premier and the defendant hospitals “actually operate” is the parties’ JOA. The majority concedes that the JOA vests Premier with control over the hospitals’ “management functions,” but insists — without discussion of the agreement’s terms — that “questions remain” as to whether defendants are guided by a single corporate consciousness. Review of the JOA should resolve those questions. From. the outset, the JOA identifies corporate unification as an overarching goal: “The vision of the Parties is to create and operate the JOC [joint operating company] Network as a multi-entity, integrated health care delivery system for the Miami Valley Region that is positioned for the future and not simply a continuation , of the large JOC Hospitals.”
Executing on that vision, the agreement creates a “unity of interest” among defendant hospitals by establishing a system of shared income:,
«The JOA provides that its financial arrangements are intended to promote the functioning of Premier and defendant hospitals as an “integrated health system.”
• Defendants’ net incomes are totaled each year into a single “network net income,” to be allocated to the parties based on predetermined percentages in the JOA.
• Defendants also shape losses according to the same predetermined percentages.
Most importantly, the allocation of network net income is not linked to any individual hospital’s revenue or profitability. For example, défendant MedAmerica Health Systems is entitled to 55.35% of the network net income under the JOA. Because defendants’ revenues are combined in totaling the network net income, Me-dAmerica receives 55.35% of the profit earned from a patient regardless of whether that patient is treated at Atrium Health System, Samaritan' Health Partners, Catholic Health Initiatives, UVMC, or MedAm-erica’s 'own facility. Unlike the NFL teams in American Needle, who maintained “economic interests ... distinct from NFLP’s financial well-being,” 560 U.S. at 201, 130 S.Ct. 2201, no single hospital has any incentive to become more profitable by attracting more patients than the *950 other.[2] The majority is therefore incorrect to say “defendant hospitals compete with each other for ... patients.” They do not.
To be sure, revenue sharing is not dis-positive of single-entity status. Competitors cannot side-step antitrust liability merely by sharing revenue through a joint venture. “If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel ‘could evade the antitrust law simply by creating a “joint venture” to serve as the exclusive seller of their competing products.’ ” Am. Needle, 560 U.S. at 201, 130 S.Ct. 2201 (quoting Major League Baseball Props., Inc. v. Salvino, Inc.; 542 F.3d 290, 335 (2d Cir.2008) (Sotomayor, 'J., concurring in judgment)).
But defendants’ integration is not limited to profits and losses on a balance sheet. The JOA grants Premier significant operational authority over each defendant hospital. In particular:
• It, designates Premier as. the “operator” for all health system activities and requires Premier to coordinate and have authority over all of those activities. Premier has general authority to operate and manage the operations of the health system activities of all defendants.
• Defendant hospitals’ CEOs report to Premier’s COO.
• Each defendant’s management reports to Premier’s executives, and Premier’s ’ system vice presidents and senior vice presidents serve at the top of each department throughout the system.
• Premier has integrate4 a number of system management functions among defendant hospitals, such as managed care and legal functions, into single departments for the entire system.
• The JOA grants Premier authority and control over defendants’ strategic plans, budgets, and business plans.
• The JOA requires Premier to develop and oversee the implementation of a strategic plan for all system activities, and each defendant must comply with and implement the strategic plan.
• It also requires Premier to develop annual capital expenditure and operating budgets for the system, and each defendant must adopt and implement the budget approved for it by Premier.
• Premier’s CEO has the power to remove each defendant hospital’s CEO.
• Premier controls defendant hospitals’ material debt incurrence and negotiates and manages their relationships with insurance companies.
Although each defendant hospital retains its separate corporate existence, along with the right to amend or repeal their corporate governing documents, the JOA requires them to “take all corporate action ... as required to implement” Premier’s authority. Defendants are also, prohibited from "modifying corporate documents in a manner inconsistent with the JOA without prior approval. To the extent defendant hospitals’ corporate documents conflict with the JOA, the JOA controls.
The majority’s reply that “defendant hospitals remain separate legal entities ... [each] filing their own tax returns and maintaining a separate corporate identity with its own.CEO and Board of Directors” is beside the point. Finding an issue of fact on these grounds elevates form over substance. “[T]he question is not whether *951 the defendant is a legally single entity or has a single name”; rather, the question is one of functional reality. Am. Needle, 560 U.S. at 195, 130 S.Ct. 2201. And the functional reality is that the JOA unifies defendant hospitals under Premier’s flagship.
That reality is not changed by the fact that the hospitals maintain individually-owned assets.- Neither American Needle, nor Coppenoeld, discusses the role of asset ownership as part of'the single-entity inquiry. Yet the majority makes a point of quoting the single mention of “assets” in American Needle: “NFLP’s licensing decisions are made by the 32 potential competitors, and each of them actually owns its share of the jointly managed assets. Apart from their agreement to cooperate in exploiting those assets, including their decisions as the NFLP, there would be nothing to prevent each of the teams from making its own market decisions relating to purchases of apparel and headwear, to the sale of such items, and to the granting of , licenses to use its trademarks.” Id. at 200,130 S.Ct. 2201 (citation omitted).
This language does not establish that asset ownership is important to the single-entity inquiry. Viewed in context, the Court’s mention of assets is merely a reiteration of its primary holding; “there would be nothing to prevent each of the [NFL] teams from making its own market decisions” because they remained independent centers of decisionmaking capable of acting on separate economic interests— even while making joint decisions through the NFLP:
The 32 teams capture individual economic benefits separate and apart from NFLP profits as a result of the decisions they make for the NFLP. NFLP’s decisions thus affect each team’s profits from licensing its own intellectual property. “Although the business interests of’ the teams “will often coincide with those of the” NFLP “as an entity in itself, that commonality of interest exists in every cartel.” In making the relevant licensing decisions, NFLP is therefore ' “an instrumentality” of the. teams.
Am. Needle, 560 U.S. at 201, 130 S.Ct. 2201 (citations omitted). Here, by contrast, defendant hospitals are not capable of acting on separate economic interests. All of their profits áre shared as part of the network net income. They do not “capture individual economic benefits separate and apart from” that income. Id. Individual ownership of assets carries little weight when all the economic benefit of those assets is mutually shared.' Defendant hospitals are '- also distinguishable from the teams in 'American Needle by virtue of their decision to cede substantial operational control over to Premier. Consequently, there is something to prevent them from making “[their] own market decisions” wholly '“[a]part from their agreement to cooperate in exploiting [their individually-owned] assets.” Id. at 200, 130 S.Ct. 2201. "
To the extent that asset ownership matters, it must be evaluated as part of American Needle’s “functional analysis,” id. at 192, 130 S.Ct. 2201, which in this case directs us back to the JOA. The JOA grants Premier substantial control over the defendant hospitals’ individually-owned assets — a fact the majority does not address. Defendant hospitals are prohibited from “sellfing], conveying], transferring], or otherwise disposing] of any material asset used in JOC Activities” to any entity other than ¿ fellow defendant hospital without Premier’s prior approval. Further:
• It gives Premier- authority to use any of defendant hospitals’ resources, facilities, or- supplies for the system’s activities. ■
*952 • Plaintiff cited no evidence to dispute defendants’ claim that Premier has, in fact, consolidated programs, moved equipment between facilities, and limited procedures occurring in certain facilities.
• The JOA also authorizes Premier to assess costs to the hospitals for implementation of new technologies and programs — including building, equipment acquisition, and training costs— and Premier exercises that authority.
Functionally, defendant hospitals own their assets in name only, without deriving any individual benefit, from those assets. Defendants’ inability to manage their own assets should therefore serve as another marker of Premier’s centralized control— not a fact that brings their corporate unification into question.
IV.
In addition to defendants’ anticompeti-tive intent, and individually-owned assets, the majority finds that the anonymous H*Works statements are evidence “that defendant hospitals continue to view themselves ... as competitors in the market.” I disagree.
Setting aside the question of admissibility, this evidence does not create a genuine issue of material fact. “When the moving party has carried its burden ..., its opponent must do more than simply show there is some metaphysical doubt as to the material facts.” Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote and citation omitted). While we may reasonably infer that the issue of economic integration was within the scope of employment for some of the 44 “executives and key stakeholders” involved in the EPWorks project, the circumstances surrounding the statements do'not prove that the statements are related to that issue.
The purpose of the H*Works project was to help Premier “devise a strategic five-year plan,” and “analyze the role of Premier and its relationship to ... defendant hospitals.” (Majority opinion.) According to plaintiff, defendants “hoped to ... improve strategic integration, coordination, systems thinking and market leverage” — goals that involve more than just economic integration. The variety of topics addressed in the H*Works statements confirms as much; they include thoughts on creating a more “patient centered approach,” Premier’s need to “expand to other communities,” and complaints from doctors that Premier “must answer the ‘what’s in it for me’ question for physicians and prove it to them.”
The JOA establishes “control! ] by a single center of decisionmaking [i.e., Premier],” as well as “a single aggregation of economic power.” Am. Needle, 560 U.S. at 194, 130 S.Ct. 2201. Defendants have therefore carried their burden to establish an overall unity of interest; Plaintiff has not rebutted the factual basis for defendants’ motion. Considered in context, the H*Works statements cast no' more than a “metaphysical doubt” upon that unity. Thus, “the record taken as a whole could not lead a rational trier, of fact to find for the non-moving party,” and “there is no genuine issue for trial.” Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks omitted).

V.

Defendants’ alleged conduct in this case, if proven at trial, is indeed anticompetitive. But the Sherman Act does not proscribe unreasonable restraints on trade by a single entity; “it leaves untouched a single firm’s anticompetitive conduct (short' of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject, to § 1 *953 liability.” Copperweld, 467 U.S. at 775, 104 S.Ct. 2731. “Congress left this ‘gap’ ” purposefully, “for eminently sound reasons.” Id. A prohibition against independent action “that merely restrains trade ... could deter perfectly competitive conduct by firms that are fearful of litigation costs and judicial error.” Am, Needle, 560 U.S. at 190 n. 2,130 S.Ct. 2201. Regardless of their intent to keep plaintiff out of the market, defendants have demonstrated a complete unity of interest and a single center of decisionmaking. “Unless we second-guess the judgment of Congress to limit § 1 to concerted conduct,” Copperweld, 467 U.S. at 776, 104 S.Ct. 2731, we are without authority to check them.
For these reasons, I respectfully dissent. I would affirm the judgment of the district court.

. Citing the rule of reason seems all the more misplaced here, where plaintiff alleges that defendants’ conduct constitutes a per se violation of § 1, not a violation under the “flexible Rule of Reason.” Am. Needle, 560 U.S. at 203, 130 S.Ct. 2201.

. Additionally, defendants’ counsel represented at oral argument that Premier sets prices for all hospital services performed by physician-employees, ensuring that each hospital charges the same price for the same service.