**UNITED STATES of America, Plaintiff,**

v.

**TOPCO ASSOCIATES, INC., Defendant.**

No. 68 C 76.

United States District Court, N. D. Illinois, E. D.

Nov. 16, 1970.

37. Plaintiff's memorandum of law, p. 59.

38. Cottman Co. v. Dailey, 94 F.2d 85, 88 (4th Cir. 1938).

John E. Sarbaugh, Dept. of Justice, Chicago, Ill., for plaintiff.

Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendant.

WILL, District Judge.

The Court having heard the evidence, the arguments of counsel, and having reviewed the various briefs and other documents submitted by the parties, enters the following Findings of Fact, Conclusions of Law and Opinion.

## A.  FINDINGS OF FACT

### Topco Associates, Inc.

1.  Topco Associates, Inc. (hereinafter "Topco") is a cooperative corporation organized under the laws of the State of Wisconsin and maintains its principal place of business in Skokie, Illinois. Topco is the successor to Food Cooperative, Inc., a cooperative association organized under the laws of the State of Wisconsin in 1944.

2.  Topco is wholly owned and controlled by twenty-five independent firms engaged in the sale of grocery and related non-food products. Most of these firms (hereinafter "member chains" or "members") operate regional chains. Between them they have stores located in 33 states. These member chains, apart from their affiliation with Topco, are wholly independent, separate supermarket chains, each operating under separate and independent management.

3.  Of the twenty-five Topco members, twenty-three are small or medium sized supermarket operators; two are retailer-owned cooperative wholesalers. The members do not conduct business under the "Topco" name or mast. Each succeeds or fails as a separate entity. There is no pooling of earnings or profits, capital, management, or advertising and pro-motional resources. Each member operates independently, purchases from whom it pleases, selects the number or types of products it chooses, follows its own merchandising philosophy, prices merchandise as it wishes, adopts its own advertising and promotional strategies, and exercises independent discretion as to the location and number of stores it will operate.

4.  Topco functions as a cooperative buying organization and procures and distributes more than 1000 different food and related non-food items exclusively to its member chains, most of which are distributed under brand names owned by Topco. The brand names used for these food and related non-food products include:

| | | |
|---|---|---|
| Baby Soft | Food Club | Mel-O-Sweet |
| Beacon | Gayla | Noel |
| Bo Peep | Gaylord | Pounce |
| Country Cheese | Hampshire | Secure |
| Dartmouth | Honor Roll | Springcrest |
| d'azur | Kings Kennel | Time |
| Dining In | Kol | Topco |
| Dog Club | Lance | Top Frost |
| Elna | Mello-Sip | Top Spred |
| | Top Fresh | Valiant |

5.  In addition to those products bearing trademarks or trade names owned by Topco, Topco also procures for its members food and related non-food items, supplies and equipment which are unbranded or which bear trademarks and trade names not owned by Topco. It does not, however, normally purchase nationally advertised brands for its members who purchase such brands through other channels.

6.  Topco employs about 200 persons who are located at Topco's offices and in field procurement facilities. Topco's procurement operations are complex and extensive, involving the development of quality specifications and standards, product testing, innovation and quality control, label design and modernization, arrangements for label production and packaging, location of and negotiation with sources of supply, and product distribution.

7.  While there are exceptions, most member chains are "full" members, and

purchase from Topco most of the products offered by Topco under the numerous Topco brands.

8. Topco's predecessor, Food Cooperative, Inc., was founded by a group of small, local grocery chains, independently owned and operated, which had need for cooperatively obtaining merchandise under private label so that they could offer their customers better value in competition with the national and large regional chains which had sufficient economic power to finance their own private label programs. The principal purpose of Topco, like that of its predecessor, is to provide its members with an effective and cost competitive private label program essential for genuine competition with the national and large regional chains.

9. In 1964, Topco's member chains had combined retail sales of more than $2 billion. In 1967, the members' combined retail sales exceeded $2.3 billion; only A & P, Safeway and Kroger had greater retail sales.

10. During Topco's fiscal year ending March 31, 1968, Topco procured for and sold to its member chains food and related non-food products, supplies and equipment valued at $236,871,000 or about 10 per cent of their total sales. Of this total sales figure, products bearing Topco brands accounted for $133,-871,000, or about 6 per cent of their total sales, while sales of products which are unbranded or which bear brands owned by others totaled $102,546,000, or about 4 per cent of the members' total sales.

11. In 1967, Topco individual member supermarket sales volumes ranged from $1.6 million to $182.8 million, and 18 of its then 26 members were well under $100 million.

12. Topco members' food sales in 1966 represented the following percentages of total retail food sales in their respective marketing areas:

| Topco Member | Market Share Percentages |
|---|---|
| Allied Supermarkets, Inc. | 8.6 |
| American Community Stores Corp. | 9.5 |
| Big Bear Stores Company | 8.0 |
| A. J. Bayless Markets, Inc. | 15.3 |
| Brockton Public Markets | 1.5 |
| A. W. Cullum & Co., Inc. | 8.9 |
| Delchamps, Inc. | 7.5 |
| Eagle Food Centers, Inc. | 4.7 |
| Furr's, Inc. | 9.1 |
| Giant-Eagle Markets, Inc. | 5.5 |
| Giant Food, Inc. | 8.6 |
| Hill's Korvette Supermarkets, Inc. | 2.8 |
| Holyoke Food Marts, Inc. | 3.6 |
| The Liberal Market, Inc. | 8.2 |
| McCarty-Holman Co., Inc. | 14.6 |
| Meijer's Supermarkets, Inc. | 7.7 |
| Fred Meyer, Inc. | 4.6 |
| Milgram Food Stores, Inc. | 9.5 |
| Supreme Markets, Inc. | 1.4 |
| Penn Fruit Company | 3.8 |
| Pick-N-Pay Supermarkets | 16.3 |
| Schultz-Sav-O-Stores, Inc. | 4.4 |
| Star Markets (Cambridge) | 5.5 |
| Star Supermarkets, Inc. (Rochester) | 14.1 |
| J. Weingarten, Inc. | 9.1 |
| Average Market Share Percentage | 5.87 |

13. Topco members are scattered across the country and located essentially in different geographic markets of the country. Each member operates in competition with one or more of the national and large regional chains, as well as with numerous smaller chains and independents.

14. Topco does not own any manufacturing, processing or warehousing facilities. Items procured through Topco are in most cases shipped directly from the packer or manufacturer to the member. Payment is made, depending upon the circumstances, either to Topco or directly to the packer or manufacturer. Members pay for merchandise procured at "average cost" upon the same terms and discounts received from suppliers. The operating expenses of Topco are covered by annual service charges paid by the members and based on their gross sales.

*Topco's Corporate Structure*

15. The 25 Topco member firms own all classes of the Association's stock. The common stock, the only class of stock having voting rights, is equally divided among the member firms. Each member firm is required to purchase both common and preferred stock as a condition of membership. Members are required to purchase preferred stock in an amount determined on the basis of the

member's total retail sales. All of Topco's preferred stock is owned by the 25 member firms.

16. The Topco by-laws control the disposition, by the members, of both common and preferred stock at the time a member terminates its affiliation with the Association. These provisions prevent Topco stock from falling into the hands of non-members.

17. The business of Topco is managed by a board of 14 directors. Each member of the Topco board of directors is normally also a principal executive officer of his respective supermarket chain. Between January 1, 1960 and January 1, 1968, 28 persons served as directors of Topco. Each of these individuals also served as a principal executive officer of a member chain.

18. The Topco board of directors elects the Association's officers and appoints committee members. The principal executive officers of the Association are the Chairman of the Board, the president, an executive vice president, a vice president and a secretary-treasurer. All principal officers must be directors except that the executive vice president may be an alternate director.

*Competition in the Food Industry*

19. The food retailing industry is characterized by the dominance of the large national food chains which generally set the competitive pace. In 1967, sales of the 25 largest supermarket chains represented 85.6 per cent of total supermarket chain sales.

20. The large multi-unit retail food chains have been able to achieve significant economies and competitive advantages over smaller operators both in purchasing and distribution.

A. Purchasing advantages include the economic capacity to:

(1) demand the best products at the most favorable prices;

(2) establish highly efficient and broadly-based national purchasing organizations;

(3) undertake testing laboratories and quality control programs;

(4) innovate both in product and packaging; and

(5) integrate backward by acquiring or establishing their own production, warehousing and food distribution facilities, thereby controlling costs and sources of supply and deriving a profit both at the manufacturing or processing and retail levels.

B. Marketing advantages include the ability to:

(1) secure preferred access to the most desirable locations;

(2) build the most modern and efficient stores;

(3) expand into new areas with enough stores to support local warehouses and sales representation;

(4) amortize retail sales promotion activities;

(5) take advantage of fuller advertising exposure;

(6) experiment with loss leader and traffic building promotions;

(7) "buy" a market share in a new area by operating at a loss while making up that loss through profits from other areas where their position is well established;

(8) develop sophisticated and highly effective marketing techniques.

21. The food distribution industry has, in recent years, become more competitive. Many marketing areas are literally "saturated" with supermarkets vying for the consumer dollar. Profit margins in the industry are narrow and rivalry as to price, quality and service is keen.

22. There has been a marked concentration of economic resources and retail outlets among a few of the most powerful national and large regional food chains, while independent grocers and smaller chains have disappeared at an accelerating rate. The total number of grocery stores declined from a peak of 386,897 in 1939 to 244,833 in 1963.

*The Competitive Significance of Private
Label Products in the
Food Industry*

23. Perhaps the most competitively significant innovation of the national mass merchandisers, made possible by their size, was their exploitation of "private label" products. A & P, Kroger, Safeway and National Tea were pioneers in this development. These and other national chains arranged for their own sources of supply and frequently themselves engaged in manufacturing or acquired manufacturers.

24. Private label permitted significant competitive advantages for these chains, including:

(a) Private labels yield higher profits on products equivalent in quality to national brands which, in turn, permit lower consumer prices on products of high quality.

(b) Private labels allow the food merchandiser to exercise exclusive control over (1) product specifications, (2) sources of supply, (3) quality standards and control, (4) packaging design and procurement, (5) physical movement of the product from source to retail outlet, (6) pricing and promotion, and (7) ultimate success or failure of the product.

(c) Private labels enable the chain to bargain more favorably with national brand manufacturers and purchase national brand goods on more advantageous terms.

(d) Private labels provide the establishment of a broader supply base of manufacturers, thereby decreasing dependence upon a relatively few, large national brand manufacturers.

(e) Private labels give the retailer greater merchandising flexibility by introducing a new balancing dimension to its product mix and a versatile pricing approach depending upon marketing strategy so that in situations where nationally advertised brands are sold at or below cost, private label merchandise can serve to retain sufficient over-all margin so that operations remain profitable.

(f) A low price image can be more effectively conveyed to the public through the introduction of private label into the over-all sales mix.

(g) Consumer recognition of private label values attracts customers and builds retail sales volume and new items introduced under an established private label have ready consumer acceptance based upon other items under the same label.

(h) Customer good will is transferred from one item in the private label line to not only the entire line, but also to the store, and even the chain.

25. The use of private labels in the food industry have resulted in significant benefits to the consumer, including:

(a) The availability of new sources for a broad range of high quality products at lower prices under private label. Private labels are generally priced below national brands. On the average, advertised brand prices are about 20 per cent higher than private brand prices.

(b) The stimulation of additional innovation, lower prices, better quality and service from the national brand manufacturers.

26. Smaller manufacturers, the most common source of private label products, who are generally unable to develop national brand name recognition for their products, benefit from private label by the assurance of a substantial market for their products and by having the distributor sustain the costs and risks of product and label development, promotion and marketing.

27. The competitive importance of private labels has resulted in the availability of a broad range of private label merchandise from chains in all geographic areas of the country. In a num-

ber of product categories, over 50 per cent of supermarket chain sales are in private label products.

28. Private labels are one of the few merchandising elements which place emphasis upon lower cost, guaranteed quality and lower consumer prices and yet which cannot be precisely duplicated by a competitor.

29. The private labels of the national and large regional chains are, of course, exclusive to each respective chain. Although some of these chains may engage in wholesaling activities, they retain their private labels for their own exclusive use.

30. Through Topco, the member chains procure their private label products cooperatively. In the opinion of Topco members and directors, their cooperative private labels would not be meaningful as competitive tools if they were not also exclusive.

31. A reasonably comprehensive private label program must cover many hundreds of items and reflect two or even three quality lines. The big three of the industry, A & P, Kroger and Safeway, all have over 1,000 items in their private label lines.

32. A successful private label program requires substantial sales volumes in each product category to justify the heavy costs of development of the product under private label, including continuous advertising and promotion.

33. A competitively effective private label program to be independently undertaken by a single retailer or chain would require an annual sales volume of $250 million or more and in order to achieve optimum efficiency, the volume required would probably have to be twice that amount.

34. The only way that chains the size of Topco members can obtain volumes necessary to achieve effective and economically feasible private label competition with the larger chains is to become affiliated with a buying organization.

35. Many of the Topco members would not have joined Topco and many

prospective members will not join Topco without the assurance of exclusive use of the Topco private labels in their primary marketing areas.

*Topco's Policy and Practice of Exclusivity*

36. Each of the Topco member chains has executed a "Membership and Licensing Agreement" incorporating the terms of Topco's Articles of Incorporation and Bylaws, each of which agreements designates the territories in which each member may sell products bearing specified trademarks or tradenames. There are three types of licenses provided by the bylaws: "Exclusive," "Nonexclusive" and "Co-extensive."

37. An exclusive territory is one in which the member chain has the exclusive right to sell Topco branded products; a non-exclusive territory is one in which a member chain may sell Topco branded products, but not to the exclusion of others who may be licensed to sell in the same territory.

38. Co-extensive territories are of two types. The most prevalent type, and the only type of co-extensive territory defined in Topco's bylaws, is a territory in which two or more designated member chains may sell Topco branded products to the exclusion of all others.

39. Through the years standards emerged for the three different types of licenses: exclusive, co-extensive and non-exclusive. Exclusive licenses were granted essentially where the member had adequate existing or potential market coverage. In other situations, where store coverage was more limited, co-extensive or non-exclusive licenses would be granted.

40. No member chain may sell or offer for sale any Topco branded products outside the member's licensed territory, regardless of the type of territory granted, and a chain's membership may be involuntarily terminated by the Association if it violates the terms of any contract between the member and the Association, or violates any provisions of the Associa-

tion's Bylaws or Articles of Incorporation.

41. The type of territorial rights granted to the member chains is determined by the Board of Directors and the territory and territory policy committees which committees, formed to study territorial conflicts among the member chains and to negotiate changes in member's territories, are composed of principal executive officers of member chains.

42. If a member expands into an area already subject to a Topco license, the expanding member either obtains a co-extensive or non-exclusive license, or uses national brands, packer labels, wholesaler-controlled labels, or another source of private brands.

43. Historically, even co-extensive and non-exclusive licenses have tended to be *de facto* exclusive. This has been largely true because no new members have been found in those general areas or because other members are geographically so widely dispersed that they have not had occasion to ask for a license in those counties. In other instances, members have left Topco or closed stores which had been located in separate trading areas of the same county and infrequently two members have each used Topco brands in the same marketing area. The effect of such a situation depends upon the number of stores involved. For the stores affected, the private labels of each member will no longer perform their basic competitive function. They will no longer serve to distinguish the store, to develop and hold customer loyalty. If more than a fringe marketing area is involved, the affected member's investment in and the competitive value of its private label program will be destroyed or severely impaired.

44. If a member or prospective member desires to use Topco brands in a territory exclusively licensed to another member or co-extensively licensed to other members, the Topco Board of Directors can change the existing license to co-extensive or non-exclusive so that the applying member can be also licensed for that county, provided that a member's primary trading area is not involved. Whether or not a trading area is "prime" depends upon many factors, including adequate market coverage and sales, character of the territory as a distinct marketing area, location of the member's principal office and warehouse, the member's potential for developing the area, and the nature and extent of competition in the market. As a matter of practice, the Board of Directors has not modified the character or limited the territory of a member's license without first consulting with and usually obtaining the consent of that member and such consent has been granted on a number of occasions.

45. The Topco licensing system apparently does not have an appreciable influence on the decision of Topco members as to whether or not to expand, or on the rate of their expansion, and there have been a number of instances where Topco members have expanded into new territories without using Topco-branded products, including areas already licensed to another Topco member.

46. The Topco licensing provisions do not control or affect prices; Topco members are completely free to sell and do sell Topco-branded products and all other merchandise at whatever price they choose.

47. As of January 1966, fifteen Topco member chains held exclusive Topco licenses in one or more counties wherein the member operated only one store, but there is no evidence that any other chains operating in these counties has sought and been denied membership in Topco.

48. In addition, seven Topco member chains hold exclusive licenses in one or more counties in which they operate no stores at present but again there is no evidence that any other chains operating stores in these counties have sought and been denied membership in Topco.

*Restrictions Upon Sales at Wholesale by Topco Members*

49. Member chains may not sell at wholesale any products supplied by the Association, whether trademarked or not,

without first receiving permission to do so.

50.  If permission to sell at wholesale is granted, the member must agree to restrict the sale of Topco branded products to a specific geographic area, and the method of selling must conform in all respects with the Association's policies.

51.  Although the Association's Board of Directors has the power to grant or deny permission to sell at wholesale, this power has been exercised only after consulting with and giving consideration to the wishes of other affected "licensee" members.

52.  Members have sought and been denied licenses to sell products supplied by the Association at wholesale.

53.  With five exceptions, all of the member firms have agreed that they will not sell products supplied by the Association at wholesale.

### General

54.  Membership in Topco is not static, but changes frequently as new, smaller members enter and old, larger members leave.  Topco is constantly seeking to add new members in areas where distribution of Topco-branded products is limited or non-existent.

55.  Generally, the Topco members have been independently unable to develop efficient or effective private label programs of their own because individually they have not had the resources to procure a broad line of products, maintain quality control procedures, and provide modern labels.  As Topco members have grown to a point where they can independently undertake a successful private label program of their own, a number have left Topco.  Resignation may be accomplished upon 60 days notice.

56.  With few exceptions, Topco member chains are licensed to sell, and do sell, Topco branded products in all of their retail outlets.

57.  In a few instances where Topco members do operate stores in territories not licensed by Topco the unlicensed stores are located in areas which could not, because of the distances involved, be adequately served by the member's warehouse facilities.  Most of the unlicensed outlets are leased departments in discount or department stores, and are not independent supermarkets.

58.  The agreements among the member chains to allocate geographic markets and classes of customers tend to eliminate competition in Topco branded products between Topco members though substantially increasing the members' ability to compete with other chains, national and local.

### B.  CONCLUSIONS OF LAW

1.  The Court has jurisdiction of this cause and of the defendant herein.

2.  The defendant is engaged in interstate commerce.

3.  In over-all economic effect, the Topco cooperative serves a legitimate pro-competitive purpose by (1) providing its members with commonly procured products to offer the consumer another choice of high quality, low price, private-label merchandise; (2) enhancing the ability of its members to compete more effectively in their respective markets against the stronger national and large regional chains; (3) enabling its members to exist as independently owned and operated businesses; and (4) benefitting the small manufacturers and processors which are the principal source of private label products.

4.  The Topco licensing provisions are not inherently unreasonable and have no substantial adverse effect on competition in the relevant market.  They are ancillary and subordinate to the fulfillment of the legitimate, procompetitive purpose of the Topco cooperative, reasonable and in the public interest.

5.  The Government has failed to establish a violation of Section 1 of the Sherman Act.  (15 U.S.C. Section 1)

### OPINION

The Government here seeks an injunction against the defendant, Topco Asso-

ciates, Inc. (hereinafter "Topco") to prevent the latter from limiting or restricting the territories within which its members may sell Topco-controlled brands, or limiting or restricting its membership on a territorial basis. It urges that the practice, authorized by Topco's by-laws, of granting "exclusive," "non-exclusive" and "co-extensive" memberships constitutes a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

Topco, on the other hand, answers that its territorial limitations on membership are necessary to enable its members to compete effectively with the national food chains, the limitations on competition in Topco-controlled brands resulting therefrom are far outweighed by the competitive advantages thereof and, accordingly, on balance are reasonable and not violative of Section 1 of the Sherman Act.

As the Findings of Fact delineate in some detail, which will not be repeated here, Topco is an association of small or medium sized regional supermarket chains, at the moment 25, who operate stores in some 33 states. Topco's sole function is to serve as a cooperative buying organization through which its members can purchase in excess of 1,000 different items, most of which are sold under brand names owned by Topco. Its members purchase only such items as they desire and Topco does not purchase nationally advertised brands for its members who acquire them through other distribution channels.

Topco's members vary in the degree of market share which they possess in their respective areas from 1½ per cent to 16 per cent, but collectively, their combined retail sales of more than $2 billion are exceeded only by the retail sales of A & P, Safeway and Kroger. Topco procured products represent about 10 per cent of the members' total sales. The Topco members compete in their respective areas not only with one or more national chains but with other regional or local chains as well as with independents.

Topco membership may be either "exclusive," "non-exclusive" or "co-extensive" as its board of directors determines. Most memberships are "exclusive" and the member possesses the exclusive right to sell Topco-controlled brands and Topco-provided products in the geographic territory defined in its membership agreement. A non-exclusive territory is one in which a member may sell Topco products but not to the exclusion of others who may be licensed. Co-extensive territories are those in which two or more designated members may sell Topco products. Non-exclusive or co-extensive memberships are generally granted only where the member or members are not large enough to cover the area. No member may sell Topco products outside his designated territory which has apparently limited members' expansion on some few occasions although some members operate stores in other members' territories but do not sell Topco products in such stores.

Topco membership is not static. As member chains grow to the point where they can economically maintain their own private label programs, they normally drop their Topco memberships. The level of annual sales necessary to enable a chain to do this appears to be $250 million or more. Other members, of course, withdraw for a variety of reasons. Topco is constantly seeking new members either in areas in which no members now operate or to replace withdrawing members.

Virtually all of the national supermarket chains have extensive private label programs which are now an almost essential element in supermarket competition. Private label products yield higher profits on lower prices than the highly advertised national brands even though the quality of private label products is frequently equivalent to that of the advertised brands. If a supermarket chain establishes with its customers an acceptance of its private label products, it enjoys a customer loyalty which no competitor can exploit since no chain sells

its private label products to competitors. If you believe products carrying the brand names Ann Page, Jane Parker, Bokar, Eight O'Clock, Sultana, etc., are the best buys for the price, you must shop at an A & P store to get them. Similarly, customers believing products bearing names such as Topco, Food Club, Elna, Top Frost, etc. are the best buys, must patronize a Topco member.

It is clear from the record that Topco members believe having an exclusivity comparable to that enjoyed by the national chains is an indispensable element of Topco's effectiveness and their interest in membership. Top officers of a number of members testified unequivocally that they would not spend the money, time and energy necessary to establish consumer acceptance of Topco brands in their areas of operation if any of their substantial competitors could likewise sell the same brand names and would not continue as members of Topco but would, to the extent possible, endeavor to develop their own private label programs in which they would have exclusivity.

The government concedes that if Topco, rather than being a buying organization for smaller local and regional chains, were a single, large national chain, none of its practices would be objectionable under the antitrust laws. It also concedes that Topco's private label program enables its members to compete more effectively both with the larger national chains, as well as with other medium or smaller regional or local chains and independents. It contends, however, that competition in Topco controlled brands is diminished and that, in any event, Topco's exclusivity practices constitute a per se violation of Section 1 of the Sherman Act even if the ultimate result of these practices may be an over-all increase in supermarket competition.

Consistent with this position, the government offered no live witness. Its case consisted solely of documents obtained from Topco, plus several newspaper advertisements disclosing that in some instances where non-exclusive or co-extensive memberships have been issued, two different local chains advertise Topco private label products in the same newspaper. In defense, Topco also offered a number of documents, as well as the oral testimony of its Executive Vice President and General Manager, executives of six of its members and two experts in supermarket merchandising, all of whom testified to the importance of private label brands in the supermarket field and the importance of exclusivity to private label programs.

In support of its per se contention, the government urges the Supreme Court decisions in three cases arising originally in this district: United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); and Serta Associates, Inc. v. United States, 393 U.S. 534, 89 S.Ct. 870, 21 L. Ed.2d 753 (1969). The first of these, *Schwinn*, was a vertical arrangement under which Schwinn, a manufacturer of bicycles, granted exclusive representation in identified geographic areas to certain dealers thereby precluding competing dealers from obtaining Schwinn bicycles, one of the leading, if not the best known, brands of bicycles and which imposed certain price and other competitive limitations on its exclusive dealers. Both *Sealy* and *Serta* involved exclusive territorial licenses for the sale of Sealy and Serta brand mattresses. The Sealy corporation was owned by the exclusive licensees who agreed not to handle competing brand mattresses and who were given exclusive rights to sell Sealy mattresses in their territories.

Serta Associates, Inc. was a corporation owned by formerly independent regional mattress manufacturers who agreed not to manufacture or sell Serta brand mattresses outside their designated geographic areas although there was no restriction upon the number or class of customers to whom a member-licensee might sell within his territory.

In each instance, it was clear that the effect of the agreements was to substantially eliminate or reduce competition either among manufacturers or dealers who might otherwise compete with each other. The government contends that the Topco exclusive territorial arrangements have the same effect and are therefore per se violative of Section 1. In addition to the foregoing, the government cites United States v. Masonite, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948); United States v. Besser Mfg. Co., 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952); White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1962); and Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), as authority for the proposition that any agreement for territorial exclusivity is prohibited by Section 1 without regard to its over-all effect on competition. They also quote from Judge Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416, 427 (C.A.2, 1945) to the effect that,

It is settled, at least as to § 1, that there are some contracts restricting competition which are unlawful, no matter how beneficent they may be; no industrial exigency will justify them; they are absolutely forbidden. Chief Justice Taft said as much of contracts dividing a territory among producers [in Addyston Pipe & Steel, supra.]

The defendant, on the other hand, urges that, from the earliest cases on, the courts have recognized that contracts which have only a remote or incidental adverse effect on competition are not prohibited, citing Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290 (1898); Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953); United States v. National Football League, 116 F.Supp. 319 (E.D.Pa.1953). They quote from Mr. Justice Brandeis in the Chicago Board of Trade case, supra 246 U.S. at p. 238, 38 S.Ct. 242, to the effect that,

In applying this test a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it. * * * The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions. It is therefore necessary in this instance to consider the economic conditions peculiar to the * * industry, the practices which have obtained, the nature of defendant's plan of making sales, the reasons which led to its adoption, and the probable consequences of the carrying out of that plan in relation to market prices and other matters affecting the public interest. * * * 288 U.S. at 360–361, 53 S.Ct. at 474.

In addition to the foregoing, the defendant has listed in a 23 page appendix to its brief a large number of cases in which arrangements or agreements resulting in some preclusion or diminution of competition were held not to violate Section 1, including a number in which territorial restrictions were involved. In Sandura Co. v. F.T.C., 339 F.2d 847 (C.A.6, 1964), the Court concluded that a system of exclusive territorial distributorships promoted inter-brand competition without any demonstrated detriment to intra-brand competition, since the record indicated that the bulk of the expense and effort necessary to develop consumer acceptance had to be borne by the distributors who testified that they would not be interested in Sandura distributorships if they were not exclusive. The Court concluded, p. 859:

* * * The distributors, the dealers and the public will best be served by

the continued economic health and competitive existence of Sandura as well as its distributors. We are of the opinion that *on this record*, the only justified conclusion is that elimination of the closed territory arrangement would impair competition, rather than foster it." 339 F.2d 847, 859.

Except for the fact that the Sandura distributorships were conferred by the manufacturer and not, as in Topco, by a board controlled by existing franchisees, the record here is virtually identical.

All of the witnesses for the defendant testified that the cost of developing consumer acceptance for the Topco private brands was born by each member in its own territory. Every executive of a Topco member who was a witness stated categorically that his chain would not be interested in devoting the time, energy and money to the necessary promotion and would not be interested in Topco membership if one or more of his chain's competitors in the area also offered consumers the same brands and products. All of defendant's witnesses asserted that monopoly of Topco private label products was as essential to Topco members as the monopoly of A & P, National Tea, Jewel and other national chains' private label products was to these chains.

Whether or not the exclusivity practices of Topco result in substantial diminution of intra-brand competition is difficult to determine. The government has introduced evidence indicating that some applications by Topco members to expand into territories assigned to other members have been denied. In some instances, this apparently led to a decision not to expand while in others, the applicant apparently expanded notwithstanding and operated the new store without Topco private label products. In a few instances, the Boston area, for example, two or three local chains, no one of which serves the entire territory, have co-extensive or non-exclusive franchises but, because of the geographic separation of their outlets, there is some question as to whether they actually compete with each other.

One other factor relevant to the possible anti- and pro-competitive effects of the Topco exclusivity practices must be noted. As previously indicated, the products which the members procure through Topco represent approximately 10 per cent of their total sales, though in some lines, such as canned foods, the percentage is much higher. It varies, of course, from member chain to member chain and from store to store depending, in part, on the degree of consumer acceptance of the Topco private brands which has been developed.

In terms of the market share in their respective market areas in which Topco members possess, the average market share of January 1, 1966 was 5.87 per cent, and ranged from 1.4 per cent to 16.3 per cent. While some are obviously significant factors in their particular market areas, all are medium-sized or small regional or local chains, and all compete with outlets of national chains as well as other local and regional chains and independents.

One conclusion which the government urges is not supported by the record, i. e., that Topco is a restrictive organization whose members are primarily interested in keeping new members out and protecting their exclusivity. While there is evidence of some instances in which members have resisted the expansion of other members into their territories or the addition of new members in the same territory, there is other evidence of occasions on which Topco members, in the interest of expanding the membership and strengthening the organization, have agreed to a reduction of their assigned territories or the type of franchise held by them.

The ultimate question here presented is whether the anti-trust laws prohibit practices by a cooperative buying organization which may reduce competition between its members or potential members in the sale of private label brands but which enable its members to compete

more effectively with national chains whose private label brands are sold exclusively through their own outlets. On the record before us it is clear that the regional and local chains who join Topco do so only because it provides them with a broad source of private label merchandise they could not otherwise obtain and which is essential to their effective competition with the national chains operating stores in their areas. In this connection, as previously noted, the government concedes that Topco, if it were a single national chain rather than a cooperative buying organization for a number of smaller regional or local chains, could restrict sales of its private label brands to its own stores without raising any question of antitrust violation.

We conclude that the Topco practices with respect to the allocation of territories to its members in which they have either exclusive, non-exclusive or co-extensive rights to sell the Topco private label brands is not a per se violation of the antitrust laws. Whatever anti-competitive effect these practices may have on competition in the sale of Topco private label brands is far outweighed by the increased ability of Topco members to compete both with the national chains and other supermarkets operating in their respective territories. Moreover, if the testimony of all the live witnesses at the trial is correct, the elimination of the Topco territorial limitations in the franchises would result in the demise of the Topco organization and its private label program with no benefit to competition in those private label brands and with a substantial reduction in the competition between its members and both the national chains and other supermarkets. Expressed another way, the relief which the government here seeks would not increase competition in Topco private label brands but would substantially diminish competition in the supermarket field. The antitrust laws are certainly not intended to accomplish such a result. Only the national chains and the other supermarkets who compete with Topco members would be benefitted. The consuming public obviously would not.

In the light of all of the foregoing, judgment will be entered for the defendant.